DECISION
{¶ 1} Relator, The College of Wooster, commenced this original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding temporary total disability ("TTD") compensation to respondent Raymond Gee ("claimant") beginning April 28, 2002, and to enter an order denying said compensation.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this case was referred to a magistrate of this court to conduct appropriate proceedings. The magistrate has rendered a decision, including findings of fact and conclusions of law, and has recommended that this court grant relator's request for a writ of mandamus ordering respondent to vacate its staff hearing officer's ("SHO") order of January 16, 2003, and in a manner consistent with the magistrate's decision, enter a new order that adjudicates claimant's motion for TTD compensation. (Attached as Appendix A.) There have been no objections filed to the decision of the magistrate.
 {¶ 3} Finding no error or other defect on the face of the magistrate's decision, pursuant to Civ.R. 53(C), we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained therein. In accordance with the recommendation of the magistrate, the requested writ of mandamus is granted to the extent that it orders respondent commission to vacate its SHO's order of January 16, 2003, and in a manner consistent with the magistrate's decision, enter a new order that adjudicates the motion for TTD compensation.
Writ of mandamus granted.
Bowman and Deshler, JJ., concur.
Deshler, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. The College of Wooster, : Relator, : v. : No. 03AP-389 Raymond Gee and The Industrial : (REGULAR CALENDAR) Commission of Ohio, : Respondents. :
 MAGISTRATE'S DECISION Rendered on December 9, 2003
IN MANDAMUS
 {¶ 4} In this original action, relator, The College of Wooster, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding temporary total disability ("TTD") compensation to respondent Raymond Gee ("claimant") beginning April 28, 2002, and to enter an order denying said compensation.
 Findings of Fact {¶ 5} 1. On February 7, 2001, Raymond Gee sustained an industrial injury while employed as an assistant football coach and physical education instructor with relator, a self-insured employer under Ohio's workers' compensation laws. The industrial claim was initially allowed for: "bruised bone left medial femoral condyle; left chondral fracture; mild sprain of left medial collateral ligament," and assigned claim number 01-816938.
 {¶ 6} 2. Claimant's injury occurred while he was demonstrating a "plyometric" exercise or technique. He landed improperly and immediately experienced acute left knee pain and swelling.
 {¶ 7} 3. In July 2001, claimant underwent left knee surgery. Cartilage was harvested for reimplantation. On December 14, 2001, claimant again underwent left knee surgery described as "an autologous Carticel reimplantation." Apparently, the two surgeries were performed by orthopedic surgeon Michael P. Mariorenzi, M.D., whose practice is located in Rhode Island, where claimant is from.
 {¶ 8} 4. On April 17, 2002, Dr. Mariorenzi wrote:
Mr. Gee is able to return to office type work only. He is not allowed to do any physical activities requiring running, cutting, jumping, coaching or prolonged standing, climbing or stooping. These restrictions will be in place for likely one year postop which would be around December of '02.
Again, I emphasize that he can do clerical, desk type and sedentary work. He is not however, allowed any active activity. To do so would significantly jeopardize the ultimate outcome of his surgical intervention.
 {¶ 9} 5. Thereafter, relator's head football coach, Michael Schmitz, who was claimant's supervisor, reviewed Dr. Mariorenzi's April 17, 2002 report and prepared a "light-duty job description" which Mr. Schmitz felt was within the physical restrictions of Dr. Mariorenzi's report. This document was apparently forwarded to Dr. Mariorenzi.
 {¶ 10} 6. By letter dated April 18, 2002, relator informed claimant that his failure to return to work by April 22, 2002 under Dr. Mariorenzi's restrictions would be "considered a voluntary termination of your employment."
 {¶ 11} 7. The record contains a letter dated April 23, 2002 from Dr. Mariorenzi to claimant, stating:
I have reviewed the job description outlined pertaining to your light duty.
Although it looks like it may drive you crazy with the clerical duties, sedentary activities and responsibilities, it is not something that physically you cannot do without detriment to your knee. From what I have read, this is all basically done sitting, mostly clerical work and therefore not contrain-dicated. The extent of time also required, although a fairly grueling schedule, also would not be detrimental to your knee.
Again, the only problem or concerns I can really raise on a medical point-of-view would be if you were required to do activities requiring squatting or any cutting, jumping and such which obviously then I would say it would be detrimental.
 {¶ 12} 8. On April 22, 2002, claimant returned to work at relator's athletics department where he shared an office with assistant coach Douglas Haas.
 {¶ 13} 9. On April 24, 2002, claimant tendered to relator his written resignation, stating:
I Raymond Gee effectively resign 4/27/2002. I believe my work environment is not helpful to my overall health both mentally and physically. * * *
 {¶ 14} 10. Beginning April 22, 2002, claimant's supervisor, coach Schmitz, kept detailed notes regarding his contacts and conversations with claimant and his contacts and conversations with other college personnel relating to claimant's return to work and resignation. Coach Schmitz's notes are contained in the record before this court.
 {¶ 15} 11. Beginning April 22, 2002, assistant coach Haas kept detailed notes regarding his contacts and conversations with claimant. Haas' notes are also contained in the record before this court.
 {¶ 16} 12. On June 4, 2002, at relator's request, claimant was examined by Stanley J. Stutz, M.D., who wrote:
* * * Based on today's exam, I find him partially disabled. He is unable to do any running, jumping, hopping, prolonged walking, or climbing. This would prevent him from doing his job that he described to me as a football coach. Based on his history, the incident of 2/7/01 is the probable cause of his present impairment.
* * *
He has not reached maximum medical improvement. He is not able to return to his pre-injury position as a football and track coach. * * *
 {¶ 17} 13. In the meantime, on April 17, 2002, five days prior to his return to work at relator's athletics department, claimant was examined by psychologist Thomas O. Hoover, Ph.D., at the request of claimant and his counsel. Dr. Hoover wrote:
The major complaints and behaviors of this patient parallel the following Axis I diagnoses which are presented in order of their clinical significance and salience. The clinical syndromes may wax and wane in their prominence and intensity depending on the presence of environmental stress. These disorders may be chronic or temporary.
309.81 Posttraumatic Stress Disorder — The PTSD is secondary to the physical aspects of the injury of 02/07/01.
296.23 Major Depression, Single Episode[.]
307.89 Pain Disorder Associated With Both Psychological Factors and a General Medical Condition[.]
* * *
This report addresses the claimant's psychological status, and is not intended to comment about physical capacity to return to former or other positions of employment.
* * *
Return to work would certainly be psychologically beneficial for this claimant; however, if he finds that he has become physically unable to return to work this will likely feed into his ongoing psychological distress. It is therefore hoped that he will be able to start psychotherapy as soon as possible to learn coping skills to deal more constructively with the depression and anxiety arising from his work injuries, the pain and negatively changed lifestyle.
* * *
I would recommend that application be immediately processed to have the psychiatric condition described above be considered as allowable under this claimant's Workers' Compensation Claim. This would permit access to psy-chiatric treatment to reinforce his planned return to work and provide him with the coping skills required in the event that as he returns to work that he may finds [sic] himself to be physically unable to return to the full range [of] his past productive employment where he had to be quite active physically.
 {¶ 18} 14. Claimant moved for the recognition of psychological or psychiatric conditions in the claim apparently based upon Dr. Hoover's April 17, 2002 report.
 {¶ 19} 15. On July 30, 2002, claimant was examined by psychiatrist Thomas J. Paolino M.D., apparently at the request of relator. Dr. Paolino wrote:
It is the opinion of this evaluator that within a certain degree of medical certainty this patient is experiencing PTSD [post traumatic stress disorder] secondary to his knee injury of February 7, 2001 while demonstrating exercises to team members. The patient's PTSD is interfering with his ability to function on a daily basis. * * *
* * *
* * * There is no evidence whatsoever to suggest that the patient is malingering or engaging in symptom exaggeration for secondary gain.
* * *
* * * While the patient is not totally disabled, his temporary disablement requires significant and extensive progress in therapy in order to adequately assess time frames for recovery.
* * *
* * * The severity of the patient's symptoms at this point have interfered with his ability to function on a daily basis with any activity, accentuated by his high level of pain, low physical functionality and feelings of fearfulness and hopelessness.
 {¶ 20} 16. The commission granted claimant's motion. The additional conditions of "post traumatic stress disorder; major depression, single episode and pain disorder" were officially recognized.
 {¶ 21} 17. On August 26, 2002, claimant moved for TTD compensation beginning April 17, 2002 based upon a C-84 report from Dr. Hoover dated April 17, 2002. The C-84 indicates that claimant was last examined by Dr. Hoover on April 17, 2002 and certifies a period of TTD from April 17, 2002 to an estimated return-to-work date of August 1, 2002. Major depression, post-traumatic stress disorder, and pain disorder are listed as the allowed conditions which prevent a return to work. The C-84 indicates that claimant is not able to return to his position of employment at the time of injury and that claimant is not able to return to other employment including light duty, alternative work, modified or transitional work.
 {¶ 22} 18. On October 22, 2002, psychiatrist James A. Gallo, M.D., of Warwick, Rhode Island, wrote:
This is to inform you Mr. Gee is currently under my care for the treatment of a Major Depressive Disorder and PTSD as a result of his injury 2/7/01 while working as a football coach. On his last clinical evaluation, 10/22/02, he continues to struggle with anxiety and depression. He is unable to return to coaching due to his fears of getting hurt again and his fear of failing due to his physical limitations. His depressive symptoms are due to the loss of a career that he loved and his chronic daily pain and disability. His current medications are Paxil CR 12.5 mgs QD and Restoril 30 mgs QHS PRN and are necessary to treat this current condition. This is my opinion with[in] a reasonable degree of medical certainty.
 {¶ 23} 19. Following an October 28, 2002 hearing, at which claimant testified, a district hearing officer ("DHO") issued an order granting TTD compensation. The DHO's order states:
Temporary total disability is granted from 04/28/2002 through 07/31/2002[.] [T]emporary total disability compensation may be considered from 08/01/2002 through 09/04/2002, with medical evidence. The injured worker returned to work with a different employer on 09/05/2002.
This decision is based on the C-84 report from Dr. Hoover dated 04/17/2002, and the injured worker's testimony at hearing.
The injured worker did return to a light duty position with the employer, but this involved a 70/80 hr. work week where the injured worker was placed in an office to type. Pursuant to the injured worker's testimony, he was not included in coaching meetings. Although Dr. Hoover did state work would be positive for the injured worker, the light duty position provided by this employer is found to be of a questionable good faith and further to have been psychologically debilitating. The injured worker did return to work on 09/05/2002, which bolsters his credibility.
 {¶ 24} 20. Relator administratively appealed the October 28, 2002 DHO's order. In support of its appeal, relator submitted the affidavit of coach Schmitz, executed January 5, 2003. The Schmitz affidavit states:
* * * Mr. Gee did return to work in the Athletic Dept. of the College on April 22, 2002. He shared an office with Assistant Coach Douglas Haas.
* * * Mr. Gee was provided with a chair and desk at which to work. He requested a different chair, which was provided. He was instructed that he could take whatever breaks he needed for his knee. He was told that we did not want him to do anything that would jeopardize the rehabilitation of his knee.
* * * I had daily interaction with Mr. Gee so that I could be sure he was not being asked to do anything outside of his restrictions. All other staff members were advised that Mr. Gee would be restricted to sedentary work so that he would not be asked to perform inappropriate tasks. I kept contemporaneous notes of my interactions with Mr. Gee and any other incidents relating to Mr. Gee that occurred during the period of April 22 through April 29, 2002. * * *
* * * Routinely, the football coaching staff meets at 8:30 a.m. each day for the purpose of organizing the workday and reviewing issues of importance to the program. By April 22 each year, the primary item on our daily staff meeting agenda is the finalization of our recruiting efforts with prospective student-athletes who have not yet made decisions. Since Mr. Gee was not involved in the 2002 recruiting process, no practical reason existed for him to be part of these discussions.
* * * Mr. Gee was expected to keep a daily schedule of work hours that was equitable with the hours of other staff members. During this time of the year, the workdays for our coaching staff begin at 6:00 am Mondays and Thursdays, 8:30 a.m. on Tuesdays and Thursdays [sic] and 10:00 a.m. on Fridays.
* * * Each coach on the staff is expected to return to the office in the evening, Sundays through Thursdays for the purpose of making phone contacts with prospective student-athletes. Each coach has the autonomy to determine his hours, with the expectation of making 60 home contacts per week as the minimum.
* * * Staff members are also expected to be available to host prospective student athletes and their parents on both weekdays and Saturdays.
 {¶ 25} 21. Relator's administrative appeal was heard on January 16, 2003 before a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record. Claimant testified that he did not see Dr. Hoover after the April 17, 2002 examination, and that he did not receive a C-84 from Dr. Hoover on that date.
 {¶ 26} 22. During the hearing, the following exchange occurred between relator's counsel and claimant:
[Relator's counsel] Okay. You were never asked to do anything outside the job duties that were provided in that work description, were you?
[Claimant] I was just told to go sit in that little cubicle and type for 60, 70 hours a day [sic]. And, you know, I wasn't — there wasn't no meetings, you know. I asked for them to review my workplace, and my desk and everything was removed, and I didn't feel very comfortable. There were several times where I told Mrs. Posten [relator's workers' compensation administrator] that, you know, I am being harassed, you know, I felt as though I'm a piece of dead wood, they don't want me there because I can't fulfill, you know, my expectations, you know. Basically her response was they can't do that.
* * *
[Relator's counsel] Okay. Isn't it true that you were given a list of things that Coach Schmitz wanted you to do; in particular, contact the high school football coaches?
[Claimant] Yes.
[Relator's counsel] That was your job, was to make telephone calls to these people?
[Claimant] Yes.
[Relator's counsel] But you didn't like that job?
[Claimant] Not that I didn't like it, you know, I was — I was hired to coach, and — and that's something that I loved and I really enjoy, and enjoyed doing.
[Relator's counsel] Certainly.
[Claimant] And, you know, because of the nature of my injury, with my career being in jeopardy with the combination of, you know, my personal stress, the harassment, I didn't feel as though that environment was — was favorable, was fair to me personally. You know, at the same time, you know, Human Resources is supposed to be an advocate for the employees, you know. I told Mrs. Posten, okay, about, you know, the harassment, I was being pressured with it, and nothing wasn't being done. When I — when I — when I —
* * *
[Relator's counsel] Then you voluntarily resigned, submitted your resignation, correct?
[Claimant] Well, I resigned due to the fact of, one, my own not too well-being, my physical well-being, as well as the harassment that was upsetting me.
[Relator's counsel] No physician or psychologist told you to resign, did they?
[Claimant] I felt as though I was putting myself in danger personally.
[Relator's counsel] My question though is, no physician —
[Claimant] I'm not a physician.
[Relator's counsel] No physician or psychologist told you to resign?
[Claimant] Correct.
[Relator's counsel] Okay. You were not re-employed until September 5th of 2002?
[Claimant] Yes.
[Relator's counsel] And your position now is with the Boston City Schools?
[Claimant] Correct.
[Relator's counsel] And that is teaching Phys. Ed.?
[Claimant] Yes.
[Relator's counsel] Are you coaching?
[Claimant] No.
 {¶ 27} 23. At the January 16, 2003 hearing, relator submitted coach Schmitz's notes regarding his contact with claimant beginning April 22, 2002. Coach Schmitz's notes of April 22, 2002, April 23, 2002 and April 24, 2002, state:
1. Met with Raymond in the morning with Bob Malekoff [relator's Director of Physical Education, Athletics, and Recreation] present[.]
a. Asked him to give us and [sic] update on his progress[.]
"Long recovery period — 1 full year from 12/14/ no standing for long periods — no stairs — no coaching[.]"
Any of the above could destroy any progress after surgery[.] Likely that he cannot coach[.]
b. Foreseeable future:
"[G]et healthy[.]" "[T]hat's all I can really be concerned about[.]"
c. Asked about what he is thinking — unrelated to any restrictions imposed by surgery[.]
"Number of things going through my mind — If procedure is successful — would like to coach again — If not successful — not going to coach[.]"
d. Presented him with the outline of the tasks that he can perform[.]
"I can't do this[.]" "Can't live up to your or my own expectations[.]"
"I think it is best for me to separate myself from the football program[.]" "I am afraid that I will push too hard if I am around[.]"
2. Amended the expectations — less specific[.]
a. [W]ent into his office myself — said to Ray: "This is an outline for discussion — you tell me what you are comfortable with[.]"
[H]e did not give me an answer — said: "You know, coach — if my leg feels good I can do more — if not I can't[.]"
b. [T]old him "I do not want you to do anything that will jeopardize your rehab[."]
c. Asked him what he is comfortable doing today — didn't know[.]
d. Proposed calling and verifying coaches — HS numbers — calling times[.]
Brought the directory to him myself so that he did not have to get out of his chair — explained exactly what I wanted him to do[.]
His entire output for the entire day was calling five high schools.
He changed into shorts and a T-shirt and went to weight room to talk with players — standing for periods of time[.]
He faxed the expectation list to his doctor[.]
He talked with his girlfriend on the phone[.]
* * *
4/23/2002
Ray arrived at approximately 8:10[.]
Went in and said "Good Morning" to him[.]
Asked him how he was feeling — said "I am feeling better[.]"
Asked why he did not come into the office last night — He defensively said "because I was not feeling well — like I told you in the afternoon[.]"
Spent from approximately 8:15 am until 10:00 am faxing information regarding his situation and having phone conversations with parties unknown regarding his situation[.]
At 9:59 am Ray walked to my door and said "I am going to meet with Gary[.]" (Thompson — at Human Resources[.])
Meeting lasted until approximately 11:25 — at which time he returned to the office — and made SIX PHONE CONTACTS TO HIGH SCHOOLS relative to his assigned duties (within the parameters of the limitations as set forth by his physician) in the football office.
D[oug] H[aas] related to me late this morning that Ray placed a call to the Unemployment Office inquiring about any Unemployment benefits that he might be eligible for[.]
1:50 pm — After conversation w/ Bob Malekoff regarding his 10:00 am meeting w/ Gary Thompson in Human resources — Ray informed Bob that "he was not feeling well" — told Bob "I need to go home[.]"
When I got back to my desk after a conversation w/ Bob Malekoff — there was a note on my desk saying "went home — not feeling well. See you tomorrow[.]"
In the meeting w/ Bob Malekoff — Ray said that "he cannot work in this environment[,]" "too much pressure with the deadlines[.]" ([A]pparently referring to expectations regarding assigned tasks[.])
Ray said that "he needed to be able to elevate his leg" to which Bob replied "What do you need — We will get you a stool or a chair or whatever you need[.]"
Ray said "I may resign[.]"
On his task list today — Ray called SIX High Schools to verify coaches names — phone numbers and best times to call[.]
TOTAL FOR 2 "DAYS" WORK IS 11 HIGH SCHOOL CONTACTS[.]
MR. GEE DID NOT RETURN TO THE OFFICE IN THE EVENING[.]
4/24/2002
Mr. Gee arrived at 8:07 — I said "Hi Ray[.]"
He asked to borrow my office keys to open his door — I obliged him — he opened the door and brought the keys back to me.
As soon as he sat down at his desk, he picked up the phone and dialed an unknown number (Not a High School to verify coach — phone number — best time to call[.] At the same time as he is on the phone, he begins to print something off his computer; I heard at least 10 jingles from his computer (10 pages)[.]
9:40 am — went into Mr. Gee's office — he was at his desk working on the computer — when I walked up to speak with him — he closed the file that he was working on.
I then asked him how he was feeling — he said "Well, you know coach, I have pain shooting through my back[.]" — "[T]his chair just doesn't work[.]"
I asked him how he is coming with the project of calling high schools to verify head football coach — phone numbers and best time to call — he responded "I'm doing what I can[.]"
I asked him how many contacts he has made — he held up a legal pad and counted each one — 1 through 19 — told him I was really planning to have that project finished today — he said "I am doing what I can, coach[.]"
Approximately 10:00 — 10:30 am — Ray met in his office behind closed doors with an unknown female. Since it is Doug Haas' office as well — he unlocked the door and entered. I heard an introduction, but not certain who the person was with whom he was meeting.
The female w/whom Ray met was Tracie Posten from Human Resources. I called Tracie and she told me that as a rule, they stop at the job site to meet with a employee once they return to work after a Workers' Comp claim. It was basically a courtesy call — to see if the environment is within guidelines etc.
At approximately 10:50 — I was walking through the back parking lot of the PEC [physical education complex] to go to the golf course to teach my class which begins at 11:00 am. Mr. Gee was getting in his car with a folder in his hand I do not know where he was going.
When I returned from golf class, Doug Haas informed me that Ray told him he was going to meet with Anne Gates, the Secretary of the College.
Subsequently, I placed a call to Anne Gates to inquire about the meeting. I asked her if she was at liberty to discuss with me the nature of the meeting. She indicated that she was, and we had a conversation that lasted about 20 minutes. She indicated that Mr. Gee was concerned about a "hostile work environment." She read to me the College policy regarding "work environment". I assured her that the working environ-ment for Mr. Gee was NOT hostile in any way.
Doug Haas informed me in the early afternoon that Mr. Gee set up a meeting with Barbara Hetrick, Vice President for Academic Affairs, for the purpose of tendering a letter of resignation. It was Coach Haas' understanding that the resignation was as of 4/27/2002.
I entered the office shared by Mr. Gee and Doug Haas to ask Coach Haas a question regarding recruiting. Mr. Gee was on the phone when I entered the office. I overheard in his conversation the statement: "I am not giving up much, Mom".
At Approximately 3:00 pm, I learned in a conversation with Bob Malekoff, Athletic Director, that Mr. Gee indeed submitted his resignation.
(Emphasis sic.)
 {¶ 28} 24. Following the January 16, 2003 hearing, the SHO issued an order stating:
The order of the District Hearing Officer, from the hearing dated 10/28/2002, is affirmed.
Therefore, temporary total compensation remains correctly ordered paid for the amended requested period of 04/28/2002 through 07/31/2002. The self-insured employer is to consider payment of temporary total compensation for the period of 08/01/2002 through 09/04/2002 upon submission of proof. The injured worker returned to work for a new employer on 09/05/2002.
The C-84 of Dr. Hoover dated 04/17/2002 remains persuasive to establish that the injured worker was prevented by the allowed psychological conditions from returning to either his former position or any other position of employment (see box F of the C-84). Although the injured worker attempted to return to light duty work, he was clearly unable psychologically to handle even that work. His testimony at today's hearing is persuasive to validate Dr. Hoover's report and opinion. As such, the injured worker was prevented by the allowed psychological conditions from performing any work beginning 04/28/2002 through 07/31/2002. His resig-nation was due to his psychological stress, per his testimony at today's hearing. Therefore, the resignation was not voluntary.
 {¶ 29} 25. On February 4, 2003, another SHO mailed an order refusing relator's administrative appeal of the SHO's order of January 16, 2003.
 {¶ 30} 26. On April 21, 2003, relator, The College of Wooster, filed this mandamus action.
 Conclusions of Law {¶ 31} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 32} R.C. 4123.56(A) provides for the payment of compensation for temporary total disability. It further provides that payment shall not be made "when work within the physical capabilities of the employee is made available by the employer or another employer."
 {¶ 33} Supplementing the statute, Ohio Adm. Code4121-3-32(B)(2) provides that TTD compensation may be terminated after a hearing:
(d) Upon the finding of a district hearing officer that the employee has received a written job offer of suitable employment.
Ohio Adm. Code 4121-3-32(A) provides several definitions applicable here:
(2) "Physical capabilities" includes any psychiatric condition allowed in a claim.
(3) "Suitable employment" means work which is within the employee's physical capabilities.
(4) "Treating physician" means the employee's attending physician of record on the date of the job offer, in the event of a written job offer to an employee by an employer. * * *
* * *
(6) "Job offer" means a proposal, made in good faith, of suitable employment within a reasonable proximity of the claimant's residence. If the claimant refuses an oral job offer and the employer intends to initiate proceedings to terminate temporary total disability compensation, the employer must give the claimant a written job offer at least forty-eight hours prior to initiating proceedings. * * *
 {¶ 34} It has been held that a claimant's rejection of his employer's job offer can justify termination of TTD compensation only if the job description comports with the treating physician's release to light duty work. State ex rel. Coxson v.Dairy Mart Stores of Ohio, Inc. (2000), 90 Ohio St.3d 428.
 {¶ 35} In State ex rel. Ramirez v. Indus. Comm. (1982),69 Ohio St.2d 630, the court defined temporary total disability under R.C. 4123.56 as a disability which prevents a worker from returning to his former position of employment. The former position of employment is the group of tasks and responsibilities making up the duties of the employee at the time of his injury. Id. at 632. Speaking of the Ramirez test for determining TTD, the court in State ex rel. McCoy v. Dedicated Transport, Inc.,97 Ohio St.3d 25, 33, 2002-Ohio-5305, explains:
* * * The test itself does no more than fix the demands of the former position as the standard by which to gauge the claimant's medical impairment in disability terms; it has absolutely nothing to do with conditioning eligibility for TTD compensation on the actual availability of the former position of employment.
 {¶ 36} It is well-settled that a voluntary abandonment of the former position of employment can bar TTD compensation. However, an injury-induced abandonment is never considered to be voluntary. State ex rel. Rockwell Internatl. v. Indus. Comm.
(1988), 40 Ohio St.3d 44.
 {¶ 37} In State ex rel. Diversitech Gen. Plastic Film Div.v. Indus. Comm. (1989), 45 Ohio St.3d 381,383, the court states:
* * * The question of abandonment is "primarily * * * [one] of intent * * * [that] may be inferred from words spoken, acts done, and other objective facts. * * * All relevant circum-stances existing at the time of the alleged abandonment should be considered." * * * The presence of such intent, being a factual question, is a determination for the commission. * * *
 {¶ 38} It is also well-settled that the claimant does not have a burden of disproving a voluntary abandonment of the former position of employment in order to show entitlement to TTD compensation. State ex rel. Superior's Brand Meats, Inc. v.Indus. Comm. (1997), 78 Ohio St.3d 409. The burden of proof with respect to voluntary abandonment falls upon the employer or the administrator. Id.
 {¶ 39} The claimant's burden is to persuade the commission that there is a proximate causal relationship between his or her work-connected injuries and disability, and to produce medical evidence to this effect. State ex rel. Quarto Mining Co. v.Foreman (1997), 79 Ohio St.3d 78, 83. The claimant's burden in this regard does not extend so far as to require him to raise, and then eliminate, other possible causes of his disability. Id. Where a claimant establishes a prima facie causal connection based upon medical evidence, the burden should then properly fall upon the employer to raise and produce evidence on its claim that other circumstances independent of the claimant's allowed conditions caused him to abandon the job market. Id.[1]
 {¶ 40} Analysis begins here with the observation that relator never claimed that claimant was medically able to return to his former position of employment for the period of compensation at issue. On April 17, 2002, Dr. Mariorenzi clearly stated that "Mr. Gee is able to return to office type work only" and that the "restrictions will be in place for likely one year postop which would be around December of '02."
 {¶ 41} Relator did not challenge Dr. Mariorenzi's restrictions. Rather, relator accepted those restrictions and, through coach Schmitz, a "light-duty job description" was drafted for claimant to return to. Relator's April 18, 2002 letter to claimant informing him that he was expected to return to work by April 22, 2002, was apparently relator's endeavor to use Ohio Adm. Code 4121-3-32(A)(6)'s provision for a job offer as it relates to TTD. Relator made it clear in its letter that claimant's failure to return to alternative employment at the athletics department would be viewed as a voluntary termination or abandonment of employment.
 {¶ 42} Claimant did return to alternative employment at the athletics department on April 22, 2002, pursuant to the written job offer but, two days later, resigned. Claimant's resignation was not only a refusal to continue with the alternative employment but, also, an abandonment of any hope that he might return to his former position of employment as an assistant football coach and physical education instructor.
 {¶ 43} Subsequent to claimant's resignation, relator had claimant examined by Dr. Stutz on June 4, 2002, for the physical conditions of the claim. Dr. Stutz found that claimant remained unable to return to the former position of employment and that the physical conditions of the claim had not reached maximum medical improvement.
 {¶ 44} Although claimant was examined by Dr. Hoover on April 17, 2002, five days prior to his short-lived return to the athletics department, claimant had not obtained commission recognition of his psychological conditions until some time after his resignation. Thus, the subsequently allowed psychological conditions were not considered by relator in proposing the job offer nor were those conditions considered by claimant's attending physician, Dr. Mariorenzi, when he released claimant to return to alternative employment.
 {¶ 45} When claimant moved for TTD compensation on August 26, 2002, he had by then obtained the commission's recognition of the psychological conditions. However, the commission's allowance of the additional conditions did not alter the fact that relator has never claimed nor disputed claimant's physical inability to return to his former position of employment as an assistant football coach or physical education instructor.
 {¶ 46} As previously noted, claimant's motion for TTD compensation was supported by a C-84 from Dr. Hoover certifying TTD based upon the psychological claim allowances. Claimant did not support his motion with a C-84 certifying what relator had never disputed — that claimant was medically unable to return to his former position of employment based upon the physical conditions of the claim. Claimant's failure to submit a C-84 certifying TTD based upon the physical conditions of the claim does not preclude the commission from fashioning a TTD award based upon the medical reports of record. State ex rel. NelsonMcCoy Pottery Co. v. Wilson (1990), 56 Ohio St.3d 28 (commission could award TTD based upon the report of Dr. Wehr who found that claimant's pulmonary silicosis caused breathing difficulty, coughing spells, and marked chest pain).
 {¶ 47} Claimant was entitled to payment of TTD compensation based upon the allowed physical conditions in the claim unless relator could prove that it had made a good-faith offer of suitable employment and that claimant had voluntarily resigned for reasons unrelated to his industrial injury. Relator had the burden of proof as to whether the job offer was suitable and made in good faith. Relator also had the burden of proof as to whether the resignation was voluntary.
 {¶ 48} Claimant's submission of a C-84 from Dr. Hoover certifying TTD as of April 17, 2002 based upon the psychological conditions of the claim must be viewed as claimant's defense to an anticipated claim by relator that TTD compensation is barred by an alleged voluntary abandonment of employment. However, relator seems to confuse the issues here by suggesting that claimant has the burden of proof that the psychological conditions precluded him from returning to his former position of employment. Claimant had no such burden. Claimant was entitled to defend relator's anticipated claim that the resignation was voluntary.
 {¶ 49} Obviously, one way of showing that the resignation was involuntary would be the submission of medical evidence of an inability to work based upon the psychological conditions in the claim. However, that is not the only way that claimant could defend relator's anticipated claim that the resignation was voluntary.
 {¶ 50} The SHO relied upon Dr. Hoover's C-84 dated April 17, 2002 to support a finding that claimant was prevented by the allowed psychological conditions from returning to either his former position of employment or any other position of employment. If Dr. Hoover's C-84 is some evidence upon which the commission can rely to support that determination, the commission's denial of relator's claim of a voluntary resignation is supported by that evidence. Here, relator contends that the commission cannot rely upon Dr. Hoover's C-84 because, among other allegations, it is fatally inconsistent with his April 17, 2002 narrative report. The magistrate agrees.
 {¶ 51} Equivocal medical opinions are not evidence. State exrel. Eberhardt v. Flxible Corp. (1994), 70 Ohio St.3d 649, 657. Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Id. See State ex rel. Chrysler Corp. v.Indus. Comm. (1998), 81 Ohio St.3d 158, 164.
 {¶ 52} Dr. Hoover is equivocal on the question of whether, based on his one-time examination of April 17, 2002, claimant is precluded by his psychological conditions from returning to work. In his April 17, 2002 narrative report, Dr. Hoover states that "[r]eturn to work would certainly be psychologically beneficial for this claimant." However, in his C-84 dated April 17, 2002, Dr. Hoover certifies that claimant is unable to return to his former position of employment and is unable to perform even "light duty alternative work, modified work or transitional work." Those opinions cannot be reconciled. Thus, Dr. Hoover's C-84 certification of disability based on the psychological conditions cannot constitute evidence upon which the commission can rely. Eberhardt, supra. However, elimination of Dr. Hoover's C-84 from evidentiary consideration does not end the inquiry here.
 {¶ 53} The SHO further found, based upon claimant's hearing testimony, that his resignation was due to his psychological stress and, on that basis, the resignation was not voluntary.
 {¶ 54} Here, relator incorrectly suggests that the commission's determination as to the voluntariness of the resignation is purely a medical question and that the determination must necessarily be supported by medical evidence showing a medical inability to perform the offer of alternative employment. The magistrate disagrees with relator's suggestion that the elimination of Dr. Hoover's C-84 from further evidentiary consideration totally undermines claimant's defense to relator's claim that the resignation was voluntary.
 {¶ 55} Even without Dr. Hoover's C-84, there is indeed much evidence of record upon which the commission could conclude either way, that the resignation was voluntary or involuntary. That determination remains with the commission.
 {¶ 56} While the SHO's reliance upon Dr. Hoover's C-84 invalidates the SHO's order, the elimination of Dr. Hoover's C-84 from further evidentiary consideration does not necessarily invalidate claimant's defense to relator's claim that the resignation was voluntary.
 {¶ 57} What the court stated in Diversitech, supra, bears repeating. The question of abandonment is primarily one of intent that may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment must be considered. See State ex rel.Wiley v. Whirlpool Corp., 100 Ohio St.3d 110, 2003-Ohio-5100.
 {¶ 58} While claimant's "psychological stress" as identified in the SHO's order can be relevant to the determination of claimant's intent when he resigned, it remains largely unexplained in the SHO's order. See State ex rel. Noll v. Indus.Comm. (1991), 57 Ohio St.3d 203.
 {¶ 59} The magistrate further notes that the DHO found the employer's job offer "to be of a questionable good faith." While the SHO's order states that the DHO's order is affirmed, it is unclear whether the SHO was merely affirming the DHO's ultimate conclusion that TTD compensation be awarded or whether the SHO was actually adopting the DHO's finding "of a questionable good faith" offer.
 {¶ 60} In the magistrate's view, given that this court must issue a writ of mandamus remanding this matter to the commission for further proceedings, the "good faith" issue remains for the commission's determination.
 {¶ 61} The commission must award TTD compensation based upon the physical inability to return to the former position of employment if: (1) relator's job offer is determined to not have been made in good faith; or (2) claimant's resignation is determined to have been involuntary.
 {¶ 62} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its SHO's order of January 16, 2003, and in a manner consistent with this magistrate's decision, enter a new order that adjudicates claimant's motion for TTD compensation.
[1] Quarto Mining involved the employer's challenge to a commission's award of permanent total disability compensation. However, the case is instructive with respect to this case involving a request for TTD compensation.