The STATE of Ohio ex rel. PIERRON,

v.

INDUSTRIAL COMMISSION of Ohio et al.

[Cite as *State ex rel. Pierron v. Indus. Comm.,* 172 Ohio App.3d 168, 2007-Ohio-3292.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 06AP–391.

Decided June 28, 2007.

Gibson Law Offices and Joseph E. Gibson;  and Gloria Castrodale, for relator.

Marc Dann, Attorney General, and Eric J. Tarbox, for respondent Industrial Commission of Ohio.

Sara L. Rose, L.L.C., and Sara L. Rose, for respondent Sprint/United Telephone Company.

---

FRENCH, Judge.

{¶ 1} In this original action, relator, Richard Pierron, asks this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying him temporary total disability ("TTD") compensation on the grounds that he had voluntarily abandoned his employment with respondent Sprint/United Telephone Company ("employer") and to enter an order granting that compensation.

{¶ 2} The court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals.  The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court grant a writ ordering the commission to adjudicate relator's claim. (Attached as an appendix.)

{¶ 3} In brief, relator sustained an industrial injury in 1973, when he fell from a telephone pole while working for the employer.  After spinal-fusion surgery, he returned to a light-duty position with the employer in 1974.  He worked in that light-duty position until 1997, when the employer informed relator that his position was being phased out and that he would be laid off.  Relator took regular retirement and has since received a pension from the employer.

{¶ 4} As we detail below, relator presented evidence that after his retirement, he worked about five hours per week delivering flowers during some period of time in 1997 and 1998.

{¶ 5} On June 17, 2003, relator moved for the allowance of additional conditions and for TTD compensation.  In support, he cited the June 5, 2003 report of Robert Fantasia, D.C., who had begun treating relator in 1990.  Dr. Fantasia concluded that medical conditions beyond those allowed originally were present and that these conditions were the direct and proximate result of relator's 1973

injury. Gerald S. Steiman, M.D., also examined relator and concluded that relator's medical conditions created a significant work impairment.

{¶ 6} A district hearing officer ("DHO") issued an order allowing the additional conditions, granting TTD compensation beginning June 5, 2003, and finding that relator's departure from his 1997 and 1998 flower-delivery job was involuntary and related to his 1973 injury. Upon review, a staff hearing officer ("SHO") also allowed the additional conditions, but denied TTD compensation on grounds that relator's 1997 retirement was voluntary. On appeal, as detailed in the magistrate's decision, the commission denied TTD compensation, with one member dissenting.

{¶ 7} In this original action, the magistrate found that relator had not voluntarily left his employment when he retired in 1997. Having determined that relator had not abandoned his employment voluntarily, the magistrate recommended issuance of a writ ordering the commission to consider the medical evidence of relator's alleged disability.

{¶ 8} The employer submitted five objections, three of which essentially argue that the magistrate erred in determining that relator's retirement was involuntary. The commission similarly argued that relator's retirement was voluntary because it was unrelated to his injuries and was not employer-initiated, that relator abandoned the entire labor market when he retired, and that he was not eligible for TTD compensation.

{¶ 9} Under R.C. 4123.56(A), TTD compensation is awarded during the period of healing and recovery following an industrial injury. It is well established, however, that when a claimant's voluntary actions, rather than an industrial injury, cause a loss of wages, the claimant may not be eligible for TTD compensation regardless of whether he can show a temporary and total disability. *State ex rel. Baker v. Indus. Comm.* (2000), 89 Ohio St.3d 376, 732 N.E.2d 355.

{¶ 10} In this case, the employer argues that relator's voluntary retirement in 1997, and not his industrial injury, caused his loss in wages; relator argued that the retirement was not voluntary. This court has previously explained the considerations involved in determining whether TTD compensation should be awarded to a claimant who alleges that he retired from a job involuntarily. In *State ex rel. Williams v. Coca–Cola Ent., Inc.*, Franklin App. No. 04AP–1270, 2005-Ohio-5085, 2005 WL 2364957, at ¶ 8–9, affirmed, 111 Ohio St.3d 491, 2006-Ohio-6112, 857 N.E.2d 136, we stated:

> When dealing with TTD compensation, the first determination that must be made is whether or not the relator's departure from, or abandonment of, his employment was voluntary. If his abandonment was involuntary (which includes retirement taken because of industrial injuries), TTD compensation

would be appropriate. *State ex rel. Wooster College v. Gee,* Franklin App. No. 03AP–389, 2004-Ohio-1898 [2004 WL 798452], at ¶ 36–37. On the other hand, if his abandonment was voluntary (which includes retirement for non-industrial injuries), TTD compensation is generally inappropriate.

The voluntary nature of relator's abandonment is a factual question which revolves around relator's intent at the time he retired. The Supreme Court of Ohio has directed: "All relevant circumstances existing at the time of the alleged abandonment should be considered. * * * The presence of such intent, being a factual question, is a determination for the commission." *State ex rel. Diversitech Gen. Plastic Film Div. v. Indus. Comm.* (1989), 45 Ohio St.3d 381, 383, 544 N.E.2d 677.

{¶ 11} Once it is determined that a claimant's retirement from a job was voluntary, an award of TTD compensation becomes less likely, but it is not precluded entirely. Instead, a claimant who voluntarily retired will be eligible to receive TTD compensation, pursuant to R.C. 4123.56, if he or she re-enters the work force and, due to the original industrial injury, becomes temporarily and totally disabled while working at that new job. *State ex rel. McCoy v. Dedicated Transport, Inc.,* 97 Ohio St.3d 25, 2002-Ohio-5305, 776 N.E.2d 51, at ¶ 39–40.

{¶ 12} However, a claimant's complete abandonment of the entire work force will preclude TTD compensation altogether. *Baker,* 89 Ohio St.3d at 380, 732 N.E.2d 355; *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.* (1985), 29 Ohio App.3d 145, 147, 29 OBR 162, 504 N.E.2d 451 ("voluntary retirement may preclude a claimant from receiving temporary total disability benefits to which he otherwise might be entitled, if by such retirement the claimant has voluntarily removed himself permanently from the work force"). This is so "because the purpose for which TTD was created (compensation for loss of income during temporary and total disability) no longer exists." *Baker,* 89 Ohio St.3d at 380, 732 N.E.2d 355. Thus, we must consider not only whether a claimant's retirement from a specific job was voluntary, but also whether, by retiring, the claimant intended to abandon the entire work force.

{¶ 13} With these principles in mind, we turn to relator's claim, and the magistrate's conclusion, that relator's retirement was involuntary.

{¶ 14} The magistrate concluded that relator's retirement was involuntary because the employer gave relator a choice between a layoff and retirement, a choice the magistrate found to be no real choice at all. As the magistrate explained, in *State ex rel. B.O.C. Group, Gen. Motors Corp. v. Indus. Comm.* (1991), 58 Ohio St.3d 199, 202, 569 N.E.2d 496, the court found that an "employer-initiated departure is still considered involuntary as a general rule. * * * The lack of a causal connection between termination and injury has no bearing where

the employer has laid off the claimant." We cannot disagree with this well-established principle: when an employer lays off an employee, the resulting departure is involuntary.

{¶ 15} Here, however, the employer did not lay off relator. Instead, the employer gave relator a choice between a layoff (an employer-initiated departure) and regular retirement (an employee-initiated departure). We cannot conclude (and note that the magistrate did not hold) that an employer's act of offering retirement as an alternative to a layoff creates an involuntary departure as a matter of law. Instead, consistent with *Williams* and the Ohio Supreme Court cases on which it relies, the voluntary nature of relator's retirement remains a factual question that "revolves around relator's intent at the time he retired." *Williams,* 2005-Ohio-5085, 2005 WL 2364957, at ¶ 9.

{¶ 16} In *Williams,* the commission had found the relator's retirement to be unrelated to his industrial injury and entirely voluntary. While the relator introduced evidence that his retirement was involuntary because it was related to his industrial injury to his left knee, this court concluded that "there was also some evidence that his retirement was unrelated to his left knee injuries. The choice between the two was properly made by the fact finder, and we will not now disturb that result." Id. at ¶ 12.

{¶ 17} The Ohio Supreme Court affirmed, stating:

An involuntary retirement does not foreclose [TTD] compensation. *State ex rel. Rockwell Internatl. v. Indus. Comm.* (1988), 40 Ohio St.3d 44, 531 N.E.2d 678. But while [the claimant's] retirement may have been involuntary in the sense that it was due to circumstances beyond his control, it lacks the element that would preserve his eligibility for [TTD] compensation—a causal relationship to his industrial injury. Id. Accordingly, the commission did not abuse its discretion in denying [TTD] compensation.

*Williams,* 111 Ohio St.3d 491, 2006-Ohio-6112, 857 N.E.2d 136, ¶ 8.

{¶ 18} Here, the commission made a factual determination that relator's retirement was voluntary based on two factors: first, whether the employer induced the retirement; and second, whether relator's industrial injuries caused him to retire.

{¶ 19} First, as to inducement by the employer, the commission found: "The injured worker's choice to retire was his own. He could have accepted a layoff and sought other work but he chose otherwise." Admittedly, there is little evidence in the stipulated record before us to support the commission's finding; in particular, our record does not include the hearing transcripts. And we note that a six-year delay between retirement and an application for benefits would impede any examination of a claimant's intentions at the time of retirement.

{¶ 20} Nevertheless, "we need only find some evidence in the record to support the commission's determination that relator's departure was voluntary." *Williams*, 2005-Ohio-5085, 2005 WL 2364957, at ¶ 10. The commission's order cites "the evidence submitted by the parties and the evidence in the file." Before this court, the commission cites relator's own affidavit, which states that relator "took a 'regular' retirement," albeit for reasons rejected by the commission. The commission also argues:

> [Relator] could have chosen to force [the employer] to lay him off. In that case, he would have maintained his entitlement to [TTD] benefits, he would have been eligible for unemployment compensation benefits under [R.C. Chapter 4141] and, if he found work that paid less than he made at [the employer], he would be entitled to two hundred weeks of wage loss compensation (R.C. 4123.56). Alternatively, he could forego these possible benefits and choose to retire and receive a pension. The evidence before the Commission was that [relator] chose to retire.

{¶ 21} Questions of credibility and the weight to be given evidence are within the commission's discretion as fact-finder. *State ex rel. Teece v. Indus. Comm.* (1981), 68 Ohio St.2d 165, 22 O.O.3d 400, 429 N.E.2d 433. Thus, while the evidence is sparse, we conclude that there is some evidence in the record to support the commission's determination that relator's retirement was voluntary.

{¶ 22} Second, as to whether relator's injuries caused the retirement, relator contends that his injuries prevented him from performing the lineman job he held when he was injured in 1973 and forced him to hold a light-duty position, which the employer phased out in 1997; thus, in relator's view, his 1973 injuries "caused" his 1997 retirement. We do not accept this attempt at establishing a causal connection, for purposes of TTD eligibility, between relator's injuries and his decision to retire. As the commission found, there is "no medical evidence in the file that the injured worker was temporarily disabled at the time he elected to retire from his job with this employer." Thus, the commission did not abuse its discretion in finding no causal connection between relator's injuries and his retirement, or in concluding that relator's retirement was voluntary.

{¶ 23} The commission's finding that relator's retirement was voluntary does not end the matter of TTD compensation, however. As we stated at the outset, only complete abandonment of the entire work force precludes subsequent TTD compensation altogether. And when a claimant demonstrates that subsequent to his voluntary retirement, he re-entered the work force and suffered a temporary disability while on that new job, that claimant again becomes eligible for TTD compensation. Relator fails on both accounts.

{¶ 24} First, relator attempted to show that he did not intend to abandon the entire work force by presenting evidence that he re-entered the work force shortly after his retirement. Relator's affidavit states that he worked at a job delivering flowers from April 1997 to March 1998 and was paid $3.00 per hour for his work. A facsimile transmission from the flower business owner states that relator worked "for approximately 6 months. He made deliveries as needed; perhaps 5 hrs. a week." However, the commission found that this part-time work at below-minimum wages did not demonstrate relator's intent to remain in the work force, as the commission concluded that "there is no evidence whatsoever that the injured worker sought any viable work during any period of time since he retired."

{¶ 25} In *State ex rel. McAtee v. Indus. Comm.* (1996), 76 Ohio St.3d 648, 670 N.E.2d 234, the court noted that the commission had not explicitly addressed the issue of whether the claimant had abandoned the entire work force when it determined that the claimant was not entitled to permanent total disability compensation. Nevertheless, the court affirmed that denial, stating:

> [T]he commission relied on all of the evidence in the file and adduced at the hearing, and that evidence can only lead to the conclusion that [the claimant] abandoned the work force. His early retirement and receipt of Social Security benefits, his application for pension benefits, and his failure to seek other employment following his departure from [employer], all demonstrate his intent to leave the labor force.

Id. at 651, 670 N.E.2d 234.

{¶ 26} Similarly, here, the commission relied on relator's decision to retire, rather than accept a layoff, as well as his failure to seek viable employment following his departure, as evidence of his intent to abandon the entire work force. Thus, there is some evidence to support the commission's finding that relator intended to abandon the entire work force when he retired in 1997 and that therefore he is not eligible for TTD compensation.

{¶ 27} But even if relator had not intended to abandon the work force entirely, his claim for TTD compensation would fail for two additional reasons. First, only claimants who are "gainfully employed" at the time of re-injury are again eligible for TTD compensation. *McCoy,* 97 Ohio St.3d 25, 2002-Ohio-5305, 776 N.E.2d 51, ¶ 40. Accord *State ex rel. Jennings v. Indus. Comm.,* 98 Ohio St.3d 288, 2003-Ohio-737, 783 N.E.2d 898, at ¶ 5. Here, we agree with respondents that relator's part-time work delivering flowers—where the evidence shows that he worked about five hours per week for some period of time in 1997 and 1998, he earned less than minimum wage, and the "employer" made no withholdings—did not constitute "gainful employment" for these purposes.

{¶ 28} Our conclusion that relator did not re-enter the work force is also consistent with numerous references in his medical records (including records from 1998 and 1999) that he stopped working when he retired in early 1997. See, e.g., November 16, 1998 Ohio Rehabilitation Services Commission teledictation report ("He last worked on 3/31/97"); April 1, 1999 report by David C. Randolph, M.D., M.P.H. ("He states he has had no other employment since" retiring in April 1997); March 4, 2002 report by Aivars Vitols D.O., Inc. ("Claimant's last date of work was March 1997"); July 23, 2003 report by Dr. Steiman ("He stopped working in March 1997").

{¶ 29} Furthermore, even if relator's work delivering flowers did amount to a re-entry into the work force, relator did not show that he suffered a disability at the new job. Recognizing that an employee who voluntarily retires can again become eligible for TTD benefits if he or she re-enters the work force and becomes disabled at a subsequent job, the commission found "no medical evidence that the injured worker left his job at the flower shop due to the allowed conditions in the claim. In addition, there is no medical evidence supporting disability at the time of the injured worker's employment at the flower shop."

{¶ 30} We agree with these conclusions. Relator offers the June 5, 2003 report by Dr. Fantasia, which states that relator "has been totally disabled due to this injury since we have been treating [him,]" presumably since 1990, seven years before his retirement. Relator also offers his own affidavit, in which he states that his injuries forced him to quit the flower delivery work as his "low back pain and leg problems worsened."

{¶ 31} However, as the employer notes, relator offered no contemporaneous medical evidence to support his claim that he became disabled from his flower-delivery work. And with the exception of the October 2003 C–84 signed by Dr. Fantasia, none of the medical evidence in our record refers to a re-injury when relator worked delivering flowers or to an alleged inability to do this work. Thus, the commission did not abuse its discretion in determining that relator did not re-enter the work force or suffer a new period of temporary disability while at a new job.

{¶ 32} For these reasons, we sustain the commission's objection and the employer's second, third, and fourth objections. In light of our decision, we conclude that we need not address the employer's first and fifth objections. We adopt the magistrate's findings of fact as our own, except to clarify the evidence relating to relator's part-time flower-delivery employment. We sustain objections to the magistrate's conclusions of law, as discussed above, and we deny the requested writ.

Objections sustained,
and writ of mandamus denied.

KLATT, J., concurs.

BRYANT, J., concurs separately.

BRYANT, J., concurring separately.

{¶ 33} While I agree with the majority's conclusion that the requested writ be denied, I do so for slightly different reasons, and I therefore write separately.

{¶ 34} Relator's employer presented relator with two options: to be laid off or to retire early. Without question, had relator's employer simply laid relator off from his light-duty job, relator would be deemed to have been involuntarily separated from his employment. He thus would be eligible for temporary total disability compensation under the Ohio Supreme Court's decision in *State ex rel. B.O.C. Group, Gen. Motors Corp. v. Indus. Comm.* (1991), 58 Ohio St.3d 199, 569 N.E.2d 496.

{¶ 35} By contrast, had relator's employer offered relator only the opportunity to retire early, relator's accepting the opportunity would render his retirement voluntary, precluding the receipt of temporary total disability compensation unless relator met the requirements of *State ex rel. McCoy v. Dedicated Transport, Inc.*, 97 Ohio St.3d 25, 2002-Ohio-5305, 776 N.E.2d 51.

{¶ 36} Here, relator's employer combined the two options and presented them to relator. The fact that the employer presented the two options in tandem does not change the fundamental nature of either. The layoff, had relator chosen it, would still be an involuntary separation; the early retirement, in the absence of evidence that relator's injury caused him to choose retirement, remains a voluntary separation.

{¶ 37} On that premise, a couple of observations are pertinent. Initially, the commission appears to premise its finding of voluntary separation in part on the fact that his departure was wholly unrelated to relator's injury. *B.O.C. Group,* however, makes clear that a separation may be involuntary even though it is unrelated to the employee's injury. Similarly, although the commission notes that the record contains no medical evidence that relator was temporarily disabled at the time he retired, relator was performing a light-duty job, having never been released to his former position of employment.

{¶ 38} Second, relator's failure to seek employment following his separation is, in my opinion, largely irrelevant to determining whether he was voluntarily separated from his light-duty position. While a job search is a prerequisite to receiving wage loss, the decisions from the Supreme Court to date do not impose that requirement to prove an involuntary separation. Rather, relator's failure to maintain employment following a voluntary separation precludes his receiving temporary disability compensation under *McCoy.*

{¶ 39} In the final analysis, I am compelled to agree with the majority that the commission did not abuse its discretion in refusing relator's request for temporary total disability compensation because relator chose an early retirement rather than a layoff.

## APPENDIX

## IN MANDAMUS

{¶ 40} In this original action, relator, Richard Pierron, requests a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying him temporary total disability ("TTD") compensation on grounds that he voluntarily abandoned his employment with respondent Sprint/United Telephone Company and to enter an order granting said compensation.

### Findings of Fact

{¶ 41} On September 21, 1973, relator sustained an industrial injury while employed as a telephone lineman for respondent Sprint/United Telephone Company ("Sprint"), a self-insured employer under Ohio's workers' compensation laws. On that date, relator fractured two vertebrae when he fell 12 to 15 feet from a telephone pole.

{¶ 42} The industrial claim was initially allowed for "fracture dorsal vertebra; lumbar subluxation" and was assigned claim No. 535180–22.

{¶ 43} In February or March 1974, relator underwent spinal-fusion surgery.

{¶ 44} In October or November 1974, relator returned to light-duty employment at a warehouse operated by Sprint.

{¶ 45} In early 1997, relator accepted Sprint's offer of a regular retirement after Sprint informed him that his light-duty position was being phased out and that he would be laid off.

{¶ 46} From approximately April 1997 to March 1998, relator worked approximately five hours per week making deliveries for House of Flowers & Gifts, located in Vandalia, Ohio. He was paid $3 per hour for his work.

{¶ 47} Earlier, in 1990, relator began chiropractic treatments with Robert Fantasia, D.C.

{¶ 48} On June 5, 2003, Dr. Fantasia wrote:

The other medical conditions which are present and attributable to his formentioned [sic] work injury should include lumbar strain, traumatic myeoplathy [sic] and T–12 post traumatic syringolmyelia.

These conditions are a direct and proximate result of the work injury as the patient fell from a great height injuring the lower thoracic and lumbar regions.

The patient has been totally disabled due to his injury since we have been treating this patient.

{¶ 49} On June 17, 2003, citing Dr. Fantasia's report, relator moved for the allowance of additional conditions and for TTD compensation.

{¶ 50} Relator's motion prompted Sprint to have relator examined by Gerald S. Steiman, M.D., on July 23, 2003. Dr. Steiman wrote:

Mr. Pierron's history, medical record review, physical examination and pain assessment provide strong credible evidence to support the presence of a T12 post traumatic syringomyelia with traumatic myelopathy.

It is my neurological opinion that Mr. Pierron's progressive myelopathic appearance renders his condition serious and significant. * * *

When considering Mr. Pierron's objective physical findings, the history, medical record review, physical examination and pain assessment provide credible evidence that he has a significant myelopathic condition which creates a significant work impairment/disability.

{¶ 51} On August 29, 2003, relator's June 17, 2003 motion was heard by a district hearing officer ("DHO"). Thereafter, the DHO issued an order additionally allowing the claim for "T–12 post traumatic syringomyelia, lumbar strain and traumatic myelopahty [sic]." The DHO also awarded TTD compensation beginning June 5, 2003, based upon Dr. Fantasia's June 5, 2003 report. The DHO's order states:

The District Hearing Officer finds that the injured worker testified at hearing that he has not voluntarily left the work force but was involuntarily removed from a part-time job delivering flowers due to increasing pain radiating through his legs.

{¶ 52} Sprint administratively appealed the DHO's order of August 29, 2003.

{¶ 53} On a C–84 dated October 10, 2003, Dr. Fantasia certified TTD from June 17, 2001 to an estimated return-to-work date of December 30, 2003.

{¶ 54} Following an October 10, 2003 hearing, a staff hearing officer ("SHO") issued an order stating that the DHO's order was modified. The SHO granted the additional claim allowances as granted by the DHO. However, the SHO denied TTD compensation, explaining:

The Staff Hearing Officer finds that the injured worker retired from his position of employment for reasons unrelated to the industrial injury on 04/01/1997.

{¶ 55} Relator administratively appealed the SHO's order of October 10, 2003 to the three-member commission. The commission decided to hear the appeal.

{¶ 56} Following a February 19, 2004 hearing, the commission issued an order additionally allowing the claim. That portion of the order explains:

It is the order of the Industrial Commission that this claim is additionally allowed for "T–12 post traumatic syringomyelia, lumbar strain, and traumatic myelopathy." This is supported by the 06/05/2003 report of Dr. Fantasia, and the 07/23/2003 report of Dr. Steiman.

{¶ 57} The commission, with one member dissenting, denied TTD compensation with the following explanation:

As to the request for the payment of temporary total disability compensation, the Industrial Commission finds that the injured worker had a low back surgery in this claim in 1974, and that he then returned to work for this employer in a lighter-duty capacity until 1997. The job he was performing was then being phased out, and the injured worker was given the option of being laid off or taking a regular (not disability) retirement. He chose the regular retirement. The injured worker testified that he found a part-time job delivering flowers from approximately April of 1997 to March of 1998. A fax communication in the file from Kathy Magoto of the House of Flowers confirms that the injured worker did work for approximately six months making deliveries as needed, perhaps five hours a week. There is no other evidence of employment since the injured worker's retirement. The injured worker has not worked since leaving the flower delivery activity.

A review of the claim file reveals that the injured worker originally received an award for permanent partial disability of 30% in 1977. After a hearing on 11/22/1985, the injured worker was granted an increase in his percentage of permanent partial disability of 10%. The order noted that the injured worker was last paid temporary total disability compensation in 1974. There is no medical evidence in the file that the injured worker was temporarily disabled at the time he elected to retire from his job with this employer. Furthermore, there is no medical evidence of disability at or around the time of the injured worker's flower delivery activity.

From the evidence submitted by the parties and the evidence in the file, the Commission finds that the injured worker voluntarily abandoned the work force when he retired in 1997. Despite the dissent's attempt to characterize the departure from the work force as involuntary, there is no evidence whatsoever that the injured worker sought any viable work during any period of time since he retired. The injured worker's choice to retire was his own. He could have accepted a lay-off and sought other work but he chose otherwise. It is not just the fact of the retirement that makes the abandonment voluntary in this claim, as the passage of time without the injured worker having worked speaks volumes. The key point which the dissent recognized though refuses to

accept here, is that the injured worker's separation and departure from the work force is wholly unrelated to his work injury.

In *State ex re[l]. McCoy v. Dedicated Transport,* 97 Ohio St.3d 25, 2002-Ohio-5305 [776 N.E.2d 51], the Ohio Supreme Court held in the syllabus: A claimant who voluntarily abandoned his or her former position of employment or who was fired under circumstances that amount to voluntary abandonment of the former position would be eligible to receive temporary total disability compensation pursuant to R.C. 4123.56 if he or she reenters the work force and, due to the *original industrial injury, becomes temporarily and totally disabled while working at his or her new job.*

(Emphasis added.) Subsequently, in *State ex rel. Jennings v. Indus. Comm.* 98 Ohio St.3d 288, 20[0]3-Ohio-737 [783 N.E.2d 898], the Supreme Court clarified its holding in *McCoy:* "It is important to note that this holding is limited to claimants who are gainfully employed at the time of their subsequent disabilities." In this case, there is no medical evidence that the injured worker left his job at the flower shop due to the allowed conditions in the claim. In addition, there is no medical evidence supporting disability at the time of the injured worker's employment at the flower shop.

Therefore, the injured worker has not established that he is eligible for temporary total disability compensation. Accordingly, it is the order of the Industrial Commission that the request for temporary total compensation from either 06/17/2001 (according to the C84 signed by Dr. Fantasia on 10/10/2003) or from 06/05/2003 (based on the narrative report of Dr. Fantasia of that date) is denied. It is found that the injured worker did abandon and retire from his position of employment for reasons unrelated to the injury in this claim on or about 04/01/1997, and he was not employed on either of the two possible dates to start the payment of temporary total disability compensation (06/17/2001 or 06/05/2003). Therefore, the injured worker's request for temporary total disability compensation is denied.

(Emphasis sic.) The dissenting commission member wrote:

I respectfully dissent from the decision to deny the injured worker's request for temporary total disability compensation based on a finding of voluntary abandonment.

The rationale behind the voluntary abandonment theory is that temporary total disability compensation should not be paid to an injured worker if the injured worker's loss of income is due to a voluntary action the injured worker undertook rather than being due to the industrial injury. If an injured worker, for example, voluntarily retires and then later requests temporary total disability compensation, then under current case law compensation is not payable because the reason the injured worker is not working is not because of his

industrial injury, but rather is because he voluntarily chose to leave his job. This is not what has happened in this case.

In this case, it is the employer that abandoned the injured worker, not the injured worker who abandoned the employer. The injured worker is being penalized, not for his own voluntary actions, but for the employer's voluntary actions. This decision turns the entire theory of voluntary abandonment on its head.

The injured worker was working for the employer in a light duty job. There is no evidence that the injured worker ever desired to, or took any actions toward, terminating his employment. It is not the injured worker that undertook the voluntary act of retiring, rather it is the employer that terminated its employment relationship with the injured worker. It is the employer who approached the injured worker and informed the injured worker that the light duty job the injured worker was performing was being done away with. It is the employer who told the injured worker that the injured worker would either have to be laid off or would have to take a regular retirement.

R.C. 4123.56(A) provides that temporary total disability compensation is not payable "for the period when any employee has returned to work, when an employee's treating physician has made a written statement that the employee is capable of returning to the employee's former position of employment, when work within the physical capabilities of the employee is made available by the employer or another employer, or when the employee has reached maximum medical improvement." No evidence was presented that the injured worker has ever been released to perform his former position of employment or has ever been found to be at maximum medical improvement. Rather the injured worker was not receiving temporary total disability compensation in this claim only because he had been working for his employer in a light duty job within his restrictions. Once the employer did away with the injured worker's light duty job, none of the statutory criteria for denying temporary total disability compensation applied in this case. Since the injured worker is still unable to perform his former position of employment, and light duty work within the injured worker's restrictions is no longer being offered by the employer, the injured worker is again entitled to receive temporary total disability compensation.

There would be a voluntary choice by the injured worker resulting in a voluntary abandonment of employment in this case if the employer had given the injured worker a third choice (continue doing your light duty job), which the employer did not do.

Under the definition of "voluntariness" being espoused in this claim, if a prisoner on death row is given the choice of dying by lethal injection or dying

by electrocution, if the prisoner chooses to die by lethal injection because such a method is the least painful of the two choices, by making that choice the condemned prisoner has converted what was his involuntary execution by the State into a voluntary choice by the prisoner to commit suicide.

There is no authority being cited that can support the assertion that voluntary abandonment applies in the instant case. An injured worker who is unable to perform his former position of employment is not forbidden from receiving temporary total disability compensation simply because the employer offers, and then removes, an offer of light duty work. This is a dangerous, unprecedented and unsupported expansion of the voluntary abandonment theory. This decision would now permit all employers in this State to avoid paying temporary total disability compensation by simply bringing injured workers back to token light duty jobs and then turning around and doing away with those jobs shortly thereafter.

This decision turns the voluntary abandonment theory from a situation where it is the injured worker's own actions that terminate his eligibility to receive temporary total disability compensation into a situation where it is the employer's actions that terminate the injured worker's eligibility to receive compensation. It is fundamentally unfair to put the employer in control of the injured worker's receipt of temporary total disability compensation by permitting the employer to force a "voluntary" abandonment upon an injured worker.

Based upon the law, I would grant the injured worker's 06/17/2003 C86 motion in full.

{¶ 58} On June 14, 2004, relator moved for reconsideration. Thereafter, the commission denied reconsideration.

{¶ 59} On April 25, 2006, relator, Richard Pierron, filed this mandamus action.

### Conclusions of Law

{¶ 60} The issue is whether the commission abused its discretion by finding that relator voluntarily abandoned his employment with Sprint and thus is precluded from obtaining an award of TTD compensation.

{¶ 61} The magistrate finds that the commission abused its discretion by finding that relator voluntarily abandoned his employment with Sprint. Accordingly, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

{¶ 62} When an employee has taken action that would preclude his returning to his former position of employment even if he were able to do so, he is not entitled to continued TTD compensation since it is his own action, rather than the industrial injury, that prevents his returning to his former position of employ-

ment. *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.* (1985), 29 Ohio App.3d 145, 29 OBR 162, 504 N.E.2d 451 (the claimant's voluntary retirement from his employer precluded TTD compensation).

{¶ 63} However, an injury-induced retirement is not considered to be voluntary. *State ex rel. Rockwell Internatl. v. Indus. Comm.* (1988), 40 Ohio St.3d 44, 531 N.E.2d 678.

{¶ 64} In *State ex rel. B.O.C. Group, Gen. Motors Corp. v. Indus. Comm.* (1991), 58 Ohio St.3d 199, 569 N.E.2d 496, the claimant was laid off by her employer for reasons unrelated to her industrial injury. Nevertheless, the commission awarded TTD compensation for a period subsequent to the layoff. In a mandamus action, the employer contended that the layoff precluded entitlement to TTD compensation. The court disagreed:

> Relying on *Rockwell,* B.O.C. asserts that temporary total disability compensation is improper since claimant's departure was not injury-related. This is incorrect. An employer-initiated departure is still considered involuntary as a general rule. *Rockwell* did not narrow the definition of "involuntary," it expanded it. While certain language in *Rockwell* may be unclear, its holding is not. The lack of a causal connection between termination and injury has no bearing where the employer has laid off the claimant.

Id. at 202, 569 N.E.2d 496.

{¶ 65} In *State ex rel. Gen. Mills, Inc. v. Indus. Comm.,* Franklin App. No. 02AP–127, 2002-Ohio-4727, 2002 WL 31013131, the claimant was laid off from his light-duty job that the employer had provided him following his industrial injury. Subsequent to his layoff, the commission awarded TTD compensation. In mandamus, the employer attempted to distinguish *B.O.C. Group* by arguing that some of its employees were not laid off due to the fact that they had seniority over the claimant. The employer asserted that the layoff was due to claimant's lack of seniority and, thus, he should be precluded from TTD compensation. This court rejected the employer's argument.

{¶ 66} In *State ex rel. McCoy v. Dedicated Transport, Inc.,* 97 Ohio St.3d 25, 2002-Ohio-5305, 776 N.E.2d 51, the syllabus reads:

> A claimant who voluntarily abandoned his or her former position of employment or who was fired under circumstances that amount to a voluntary abandonment of the former position will be eligible to receive temporary total disability compensation pursuant to R.C. 4123.56 if he or she reenters the work force and, due to the original industrial injury, becomes temporarily and totally disabled while working at his or her new job.

{¶ 67} In *State ex rel. Jennings v. Indus. Comm.,* 98 Ohio St.3d 288, 2003-Ohio-737, 783 N.E.2d 898, the claimant was fired for unexcused absenteeism. There

was no evidence that she secured other employment. Thereafter, the commission denied TTD compensation, finding that the firing constituted a voluntary abandonment of her former position of employment. Quoting the syllabus in *McCoy,* the *Jennings* court upheld the commission's decision based upon the claimant's failure to secure another job after she was fired.

{¶ 68} In *State ex rel. Eckerly v. Indus. Comm.,* 105 Ohio St.3d 428, 2005-Ohio-2587, 828 N.E.2d 97, the claimant was fired for unexcused absenteeism. The commission declared that the claimant's discharge constituted a voluntary abandonment of his former position of employment pursuant to *State ex rel. Louisiana–Pacific Corp. v. Indus. Comm.* (1995), 72 Ohio St.3d 401, 650 N.E.2d 469, and, on that basis, denied TTD compensation.

{¶ 69} In upholding the commission's decision, the *Eckerly* court, at ¶ 9, explained:

> The present claimant seemingly misunderstands *McCoy.* He appears to believe that so long as he establishes that he obtained another job—if even for a day—at some point after his departure from Tech II, TTC eligibility is forever after reestablished. Unfortunately, this belief overlooks the tenet that is key to *McCoy* and all other TTC cases before and after: that the industrial injury *must remove the claimant from his or her job.* This requirement obviously cannot be satisfied if claimant had no job *at the time of the alleged disability.*

(Emphasis sic.)

{¶ 70} Here, the commission focused its analysis on both the retirement in early 1997 and relator's subsequent employment history. The magistrate will first address the retirement in early 1997.

{¶ 71} In explaining why it found the retirement to be voluntary, the commission concluded that relator had a choice when he was informed by Sprint that his job was being phased out and that he would be laid off. According to the commission's order, "[h]e could have accepted a lay-off and sought other work but he chose otherwise."

{¶ 72} Implicit in the commission's quoted statement is the notion that relator had a realistic hope of someday returning to light-duty work at Sprint if he were to accept the layoff and not take a regular retirement. There is no evidence in the record to suggest that the layoff was going to be temporary. The undisputed evidence is that the light-duty warehouse job that relator had held for some 23 years was "being phased out."

{¶ 73} Given the absence of any evidence that relator had a realistic hope of returning to employment at Sprint after the layoff, refusing to take a regular

retirement would seem to be foolish, if not financially unsound. The "choice" that the commission finds is not based upon evidence in the record.

{¶ 74} The retirement in early 1997 was clearly an employer-initiated departure under *B.O.C. Group*. Relator was not required under those circumstances to show that his retirement in early 1997 was injury-induced, as the commission seems to suggest.

{¶ 75} Given that relator's retirement in early 1997 must be found to be involuntary, there was no cause for the commission to engage in an analysis under *McCoy* and *Jennings*. As previously noted, *McCoy* permits a claimant to reinstate his entitlement to TTD compensation following a voluntary work departure by returning to gainful employment. Because claimant did not voluntarily abandoned his employment at Sprint, there was no cause for the commission to determine whether it might be found that relator reinstated his TTD eligibility by returning to gainful employment.

{¶ 76} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its order to the extent that it determines relator to be ineligible for TTD compensation, and to enter an amended order that adjudicates relator's request for TTD compensation based upon the medical evidence before the commission.

<div style="text-align:right">

Kenneth W. Macke,
Magistrate