[Cite as *State ex rel. German v. Provider Servs. Holdings, L.L.C.*, 2014-Ohio-3336.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Dana M. German, | : | |
| Relator, | : | |
| v. | : | |
| | | No. 13AP-149 |
| Provider Services Holdings, LLC, | : | |
| Steven Buehrer, Administrator[,] | | (REGULAR CALENDAR) |
| Bureau of Workers' Compensation[,] | : | |
| and The Industrial Commission of Ohio, | | |
| | : | |
| Respondents. | | |
| | : | |

D E C I S I O N

Rendered on July 31, 2014

*Dworken & Bernstein Co.*, *L.P.A.*, *Jonathan T. Stender*, **and** *Jo A. Tatarko*, **for relator.**

*Andrews & Wyatt, LLC*, *Thomas R. Wyatt*, **and** *Jerry P. Cline*, **for respondent Provider Services Holdings, LLC.**

*Michael DeWine*, **Attorney General, and** *Stephen D. Plymale*, **for respondent Industrial Commission of Ohio.**

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

SADLER, P.J.

{¶ 1} In this original action, relator, Dana M. German, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her request for temporary total disability ("TTD") compensation and to enter an order granting the compensation.

{¶ 2}   Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto.  The magistrate concluded that the commission did not abuse its discretion in determining that relator voluntarily abandoned her employment with both Provider Services Holdings, LLC ("PSH") and General Aluminum ("General").  Accordingly, the magistrate recommended that this court deny the requested writ of mandamus.

## I. RELATOR'S OBJECTIONS

{¶ 3}   Relator presents the following objections to the magistrate's decision:

[I.] The Magistrate ignores clear error in the SHO order that referenced a "third job" from which Relator departed.

[II.] The Magistrate failed to address Relator's arguments regarding the Staff Hearing Officer shifting the burden to Relator to disprove voluntary abandonment.

[III.] The Magistrate erred in essentially supplementing the SHO's decision by explaining and justifying her decision.

## II. DISCUSSION

### A. Background

{¶ 4}   Relator injured her lower back while cooking chicken in her employment as a dietary cook with the Geneva Pointe facility nursing home owned and operated by respondent PSH in Geneva, Ohio.  Her industrial claim was allowed for a lumbar sprain. Following her injury, relator returned to work at PSH in a light-duty position with a five-pound lifting restriction.  Relator's duties after her injury consisted primarily of standing at a "steam table" serving the meal to residents of the nursing home and washing dishes. (German Depo., 42.)

{¶ 5}   Relator resigned from PSH in March 2009.  Relator acknowledged at her deposition that she was physically able to work within her restrictions but stated she resigned, both because she was getting married and relocating to Ravenna and because she suffered pain while performing her job duties.  After relocating, relator obtained employment with General where her duties included buffing and sanding small car parts weighing "a couple pounds."  (German Depo., 37.)  According to relator, when General put

into place mandatory 12-hour shifts, she decided to resign from her position with General because, due to lower back pain, she was unable to stand longer than eight hours. According to the medical records of relator's treating physician, Todd S. Hochman, M.D., relator "got laid off" from General. (Joint Stipulation of Evidence, 2.) Relator testified that, within a month of her resignation from General, she separated from her husband and relocated to Jefferson to stay with her daughter. Relator has not worked, nor sought employment, since her departure from General.

### B. Standard for Mandamus

{¶ 6} To obtain a writ of mandamus, a relator must demonstrate that it has a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 117 Ohio St.3d 186, 2008-Ohio-541, ¶ 14. "To show the clear legal right, relator must demonstrate that the commission abused its discretion by entering an order unsupported by some evidence in the record." *State ex rel. Hughes v. Goodyear Tire & Rubber Co.*, 26 Ohio St.3d 71, 73 (1986). When the record contains "some evidence" to support the commissions factual findings, a court may not disturb the commission's findings in mandamus. *State ex rel. Fiber-Lite Corp. v. Indus. Comm.*, 36 Ohio St.3d 202 (1988), syllabus. " 'Where a commission order is adequately explained and based on some evidence, * * * the order will not be disturbed as manifesting an abuse of discretion.' " *State ex rel Avalon Precision Casting Co. v. Indus. Comm.,* 109 Ohio St.3d 237, 2006-Ohio-2287,¶ 9, quoting *State ex rel. Mobley v. Indus. Comm.*, 78 Ohio St.3d 579, 584 (1997).

### C. First and Third Objections

{¶ 7} Because relator's first and third objections are interrelated, we address them together. At issue in both objections is the magistrate's statement that "the SHO's order refers to a 'departure from the third job' when only two employers are involved here. Apparently, the SHO counted relator's return to work at PSH in a light-duty capacity as a job separate from the job she worked prior to her injury." (Magistrate's Decision, ¶ 49.) In her first objection, relator asserts that, because relator was employed with only two employers, the magistrate's above statement ignores clear error in the Staff Hearing Officer's ("SHO") decision which refers to a third job. In her third objection, relator takes issue with the same statement of the magistrate arguing that the magistrate improperly

supplemented the commission's order by adding "context and content" to the commission's decision. (Relator's Objections to Magistrate's Decision, 8.)

{¶ 8} The record is clear that relator held three different positions with two employers. While employed with PSH, prior to her injury, relator held a position as a cook, and, upon her return from her injury, she held a light-duty position in which she primarily served meals and washed dishes. After her resignation from PSH, relator obtained employment with General in which she buffed and sanded small car parts weighing approximately two pounds. Thus, we agree with the magistrate that no clear error occurred when the SHO referred to relator holding three distinct positions because such determination is consistent with the evidence in the record.

{¶ 9} Moreover, the magistrate did not impermissibly supplement the commission's order. Rather, the magistrate reviewed the facts and determined that the commission's factual findings were consistent with the evidence presented. What relator submits is an impermissible addition of content to the commission's order, we find to be an explanation of why the commission's determination that relator held three jobs was supported by some evidence and did not constitute an abuse of discretion.

{¶ 10} Accordingly, relator's first and third objections are overruled.

### D. Second Objection

{¶ 11} In her second objection, relator asserts the magistrate failed to address her argument that the commission improperly shifted the burden of demonstrating voluntary abandonment onto relator. We disagree.

{¶ 12} The magistrate recapitulated relator's argument of improper burden shifting when he stated in his opinion, "relator argues that the commission abused its discretion by requiring that she 'produce evidence that she was advised by her doctor to leave her employment.' " (Magistrate's Decision, 14, quoting Relator's Brief, 19.) The magistrate's decision accurately addresses the law applicable to voluntary abandonment and discusses *State ex rel. Mid-Ohio Wood Prods., Inc. v. Indus. Comm.*, 10th Dist. No. 07AP-478, 2008-Ohio-2453, which relator asserts stands for the propositions that a claimant neither has the burden to disprove voluntary abandonment nor is required to provide objective medical evidence corroborating her testimony regarding her motivation for abandoning her employment.

{¶ 13} In *Mid-Ohio*, we determined it to be well-settled law that a claimant does not have a burden of disproving voluntary abandonment of a former position of employment to show entitlement to TTD compensation.  In so doing, we stated:

> [W]e find nothing * * * that holds that there must be objective medical evidence corroborating a claimant's testimony regarding his motivation for abandonment of his employment.  On the contrary, as noted hereinabove, the commission must make a factual determination, based upon all of the surrounding circumstances, whether the motivation for the claimant's departure was, in whole or in part, the allowed conditions.

*Id.* at ¶ 18.

{¶ 14} Though we agree with relator's reliance on *Mid-Ohio* for the above propositions, upon careful review of the record, we find the commission's decision is devoid of any indication that the commission abused its discretion by improperly shifting the burden of demonstrating voluntary abandonment onto relator by requiring her to produce objective medical evidence corroborating her testimony that she left her employment due to the allowed conditions.

{¶ 15} On the contrary, as noted above, the commission was required to make a "factual determination, based upon all of the surrounding circumstances, whether the motivation for the claimant's departure was, in whole or in part, the allowed conditions for which the claimant has already discharged his burden of proof."  *Id.* at ¶ 18.  Here, as recognized by the magistrate, the commission, as the exclusive evaluator of the weight and credibility of the evidence, based upon the surrounding circumstances, made such a factual determination.  Accordingly, in light of relator's testimony that she resigned her employment with PSH because she was getting married and relocating and the office notes of Dr. Hochman which indicate that relator was laid off from General, the commission did not abuse its discretion in determining that relator's abandonment of both her employment with PSH and General were motivated by circumstances independent of the allowed condition.

{¶ 16} Relator next takes issue with the magistrate's statement that "[p]resumably, if relator can show that her departure from employment at General was injury induced, she can preserve her eligibility for TTD compensation that was undisputedly reestablished

during the time of her employment at General." (Magistrate's Decision, ¶ 72.) According to relator, based on the above statement, the magistrate improperly shifted the burden of disproving voluntary abandonment onto relator.

{¶ 17} A claimant carries the initial burden to " 'persuade the commission that there is a proximate causal relationship between his or her work-connected injuries and disability, and to produce medical evidence to this effect.' " *Id.* at ¶ 17, quoting *State ex rel. College of Wooster v. Gee,* 10th Dist. No. 03AP-389, 2004-Ohio-1898, ¶ 39. Once a claimant establishes a prima facie causal connection based upon medical evidence, " 'the burden should then properly fall upon the employer to raise and produce evidence on its claim that other circumstances independent of the claimant's allowed conditions caused him to abandon the job market.' " *Id.,* quoting *Gee* at ¶ 39. Contrary to relator's assertions otherwise, the above statement in the magistrate's decision does not shift the burden on relator to disprove voluntary abandonment. Rather, it recognizes relator's initial burden to demonstrate that her abandonment of her employment is causally related to her allowed condition.

{¶ 18} Finally, relator argues for the first time here that the commission abused its discretion by not stating that the employer met its burden to demonstrate voluntary abandonment. Because relator failed to raise this issue before the magistrate, relator has waived this argument. *State ex rel. Hackenburg v. Indus. Comm.,* 10th Dist. No. 06AP-938, 2007-Ohio-4181, ¶ 4. Even so, our review of the record reveals the commission's decision states "[t]he Hearing Officer finds that the Injured Worker's departure from the third job was unrelated to the allowed injury and was *voluntary.* * * * In these circumstances the Injured Worker is not eligible to receive temporary total disability compensation." (Emphasis added.) (Record of Proceedings, 2.) Thus, contrary to relator's assertions otherwise, because the commission determined that PSH met its burden to demonstrate voluntary abandonment, the commission did not abuse its discretion.

{¶ 19} Accordingly, having addressed each of relator's arguments, we overrule relator's second objection to the magistrate's decision.

### III. CONCLUSION

{¶ 20} Upon review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we find the magistrate has properly determined the pertinent facts and applied the appropriate law.  We, therefore, overrule relator's objections to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.  Accordingly, the requested writ of mandamus is hereby denied.

*Objections overruled;*
*writ of mandamus denied.*

TYACK and O'GRADY, JJ., concur.

_____

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State of Ohio ex rel. Dana M. German,            :

        Relator,                                                   :

v.                                                                          :                    No.  13AP-149

Provider Services Holdings, LLC,                      :                    (REGULAR CALENDAR)
Steven Buehrer, Administrator[,]
Bureau of Workers' Compensation[,]                :
and The Industrial Commission of Ohio,

        Respondents.                                         :

                                                                       :

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on March 27, 2014

---

*Dworken & Bernstein Co, L.P.A., Jonathan T. Stender* and *Jo A. Tatarko*, for relator.

*Andrews & Wyatt, LLC, Thomas R. Wyatt* and *Jerry P. Cline,* for respondent Provider Services Holdings, LLC.

*Michael DeWine*, Attorney General, and *Stephen D. Plymale,* for respondent Industrial Commission of Ohio.

---

## IN MANDAMUS

{¶21} In this original action, relator, Dana M. German, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her request for temporary total disability ("TTD")

compensation beginning May 25, 2011, and to enter an order granting the compensation.

<u>Findings of Fact</u>:

{¶22}  1. On October 20, 2008, relator injured her lower back while employed as a dietary cook/aide at a nursing home owned and operated by respondent Provider Services Holdings, LLC ("PSH"), a state-fund employer.  The nursing home is known as the Geneva Pointe facility which is located in Geneva, Ohio. On that date, relator was injured while lifting a strainer filled with chicken from a sink.

{¶23}  2. The industrial claim (No. 08-884141) was initially allowed for "lumbar sprain."

{¶24}  3. Following her injury, relator returned to work in a light-duty capacity. According to her deposition testimony in an action filed in the Ashtabula County Court of Common Pleas, relator had a five-pound lifting restriction.

{¶25}  4. Relator continued to work at the Geneva Pointe facility until March 2009 when she gave her employer a two-week notice that she was resigning her employment.

{¶26} 5. During her deposition, under cross-examination by PSH counsel, relator testified as to her motivation for resigning her employment at the Geneva Pointe facility:

> Q. And then under what circumstances did you leave, how did you leave Geneva Pointe?
>
> A. I went to give my two week notice, they wouldn't accept it because they said it was a three week notice, they said it was too soon and then I was moving to Ravenna and I got married.
>
> Q. So you gave them their two week notice that you were resigning?
>
> A. Yes.
>
> Q. And because you were getting married and you were moving and you couldn't work there anymore?
>
> A. Correct.

Q. You could work, you were physically capable of working but you just had to move?

A. Well, it was -- you know, I didn't go to work every day as well as I did prior to the accident. I mean, I had pain and it was hard to go in there and constantly have somebody else doing half of the job for me. Plus I was also leaving and going to Ravenna. I just felt that I probably made it harder in the kitchen than...

Q. But at the very least, when you resigned you were working within your restrictions and you were able to physically do the work every day?

A. Yes.

(Tr. 35-36.)

{¶27} 6. After her marriage and move to Ravenna, Ohio, relator found employment with General Aluminum ("General") at its plant. The job at General required her to buff car parts. Relator worked at General from September 21, 2009 to March 24, 2010. During her deposition, relator described her job at General:

Q. Physically what was involved in doing that?

A. Picking up a part and using a little sander and buffing the two spots on the part, and putting it in a crate or on the side.

Q. How much did the part weigh?

A. Maybe a couple pounds was all.

(Tr. 37.)

{¶28} 7. During her deposition, relator testified as to why she left her job at General:

Q. And you think you worked there for a couple months?

A. A few months, maybe, maybe a little bit longer, I don't really recall. I do recall working eight hour shifts and they were putting in mandatory 12 hour shifts and it was way too much for me.

Q. Way too much in what regard?

A. I couldn't do the work. I mean, I couldn't stand there any longer than eight hours a day.

Q. Physically what were your problems that you were having that you couldn't work more than eight hours a day?

A. Lower back pain and my right leg hurt so much.

* * *

Q. [A]t [G]eneral Aluminum when you were polishing the part how much did the part weigh?

A. Like one to two pounds.

Q. Was there any other lifting involved in your job at General Aluminum?

A. No.

Q. Did you ever have to lift a crate pull [sic] full of parts or anything like that?

A. No.

Q. And then how many months did you work at General Aluminum?

A. I was only there a few months.

Q. And then you decided physically you couldn't do the job?

A. Correct.

Q. Did somebody take you off work or did you just decide that on your own?

A. I just decided that on my own.

Q. Did you ever talk to Dr. Hochman about the fact that you couldn't work anymore?

A. I -- I may have told him that I didn't work anymore. I'm sure I did, I'm sure I did. I don't really recall.

(Tr. 37-38, 43-44.)

{¶29}  8.  The stipulated record contains medical records documenting the visits relator made to her treating physician Todd S. Hochman, M.D.  The records document a January 12, 2010 visit and end with a February 7, 2012 visit.  Generally, relator made monthly visits to Dr. Hochman during this two-year period.

{¶30}  9. Dr. Hochman's office note regarding relator's June 15, 2010 visit conflicts with relator's deposition testimony as to the circumstances of her departure from General:

> She is currently out of work as she was terminated by her employer. She is having significant difficulty findings [sic] work within her restrictions. She is doing the best she can.

{¶31}  10.  Relator and her husband separated one or two months after she left General.

{¶32}  11.  During her deposition, relator further testified as to the circumstances of her job departure at General and that she did not look for other work after that job departure:

> Q. And then when you were working at General Aluminum were you still having pain in your back and down into your right leg?
>
> A. Yes[.]
>
> Q. When you left General Aluminum was the pain in your low back and your leg, was it getting better or worse than it was when you left Geneva Pointe?
>
> A. I'd say it was probably about the same.
>
> Q. And I think I understand and I'm sorry to bring this up, at some point that marriage ended?
>
> A. Yes.
>
> Q. When did you and your husband separate?
>
> A. I left there in, it was around either the first or second week of April, I'm going to say, 010 [sic].
>
> Q. So -

A. Wait a minute. Let me think.

Q. Yeah, think, I don't want you to ...

A. No, it was around the end of March or April, beginning of April of [']09.

Q. Were you still working at General Aluminum?

A. No.

Q. Did you leave General Aluminum before or after you separated?

A. Before.

Q. How much time was between when you left General Aluminum and when you and your husband separated?

A. A month or two.

Q. When you separated were you working anywhere else?

A. No, I was not.

Q. After you separated did you move back?

A. I moved to Jefferson and stayed with my daughter.

Q. When you moved back to Jefferson did you try to find a job?

A. No, I did not.

Q. Have you ever worked since you left General Aluminum?

A. No, I have not.

Q. Have you tried to find work since you left General Aluminum?

A. No, I haven't.

Q. Between when you left General Aluminum and ultimately when you had to have more medical treatment did you try to find work anywhere?

A. No, I did not.

Q. And why was that?

A. I was in an awful lot of pain by that point and my daughter was taking care of me and I don't believe I could have done a job.

(Tr. 46-48.)

{¶33} 12. Following a January 4, 2011 hearing, a staff hearing officer ("SHO") issued an order additionally allowing the claim for "substantial aggravation of pre-existing lumbar spinal canal stenosis at L3-4."  The SHO's order explains:

> This finding is based on the 12/03/2008 office notes of Dr. Itani and the 05/17/2010 report of Dr. Hochman.
>
> The Injured Worker underwent back surgery on 08/30/2007 and did well post operatively to the extent that she ultimately return to work without restrictions. She injured her back again on 10/20/2008 when she lifted a heavy pot of chicken and experienced a significant worsening of symptoms. Based on the 05/17/2010 report of Dr. Hochman who found "disease progression" when "comparing the MRI studies," the Staff Hearing Officer grants the request for additional allowance.

{¶34} 13. On May 25, 2011, relator visited Dr. Hochman.  In his office note of that date, Dr. Hochman states:

> Patient returns today and we discussed several things. The claim has been recognized for clinically symptomatic lumbar spinal canal stenosis (724.02). She has been seen by Dr. Itani, the neurosurgeon. Dr. Itani has requested the decompression at L3 with fixation of L3 and L4. We submitted the C-9 requesting the surgery. * * * She does have quite a bit of pain into the right lower extremity and also pain into the left foot. * * * She continues with the tramadol for the pain. She is taking the maximum amount per day but there are no signs of misuse, abuse, diversion, or multi-sourcing. The medications help her to function through the pain.

{¶35} 14. On a C-84 dated May 25, 2011, Dr. Hochman certified TTD from May 25, 2011 to an estimated return-to-work date of September 1, 2011.

{¶36} 15. On a Physician's Report of Work Ability ("MEDCO-14") dated May 25, 2011, Dr. Hochman certified TTD from May 25, 2011 to September 1, 2011.

{¶37} 16. On August 11, 2011, relator underwent lower back surgery performed by Abdul L. Itani, M.D. In his operative report, Dr. Itani describes the operations:

> [One] Partial removal of retained fixation at L4-L5.
>
> [Two] Decompressive laminectomy, L3.
>
> [Three] Fixation L3 and L4 using screws and rod navigational system.
>
> [Four] Posterior lumbar interbody fusion at L3-L4.

{¶38} 17. On November 9, 2011, relator moved for TTD compensation beginning May 25, 2011. In support, relator submitted C-84 and MEDCO-14 reports from Dr. Hochman and the August 11, 2011 operative report of Dr. Itani.

{¶39} 18. Following a January 19, 2012 hearing, a district hearing officer ("DHO") issued an order granting TTD compensation beginning May 25, 2011. The DHO's order explains:

> The Employer's request to deny temporary total disability compensation under the proposition that Injured Worker abandoned the workforce prior to the requested temporary total disability period, was rejected, based on Injured Worker's testimony that the only reason she stopped working was because of severe limitations from this injury and a knee condition which did not allow her to work, and that but for these restrictions she enjoyed and would have liked to continue working, but had no choice other than to pursue disability.

{¶40} 19. PSH administratively appealed the DHO's order of January 19, 2012.

{¶41} 20. Following a March 27, 2012 hearing, an SHO issued an order that vacates the DHO's order of January 19, 2012 and denies TTD compensation beginning May 25, 2011. The SHO's order explains:

> The request for payment of temporary total disability compensation for the period of 05/25/2011 through 1/19/2012 is denied. Following the instant injury the Injured Worker returned to work in a light-duty position. She resigned from this position in March 2009. The Injured

Worker testified that she resigned due to a combination of injury related and personal factors. There is no contemporaneous proof from a physician that she left the job due to physical difficulties stemming from the allowed conditions. After relocating due to an upcoming marriage she began working for a temporary agency. She worked in this position from 09/21/2009 through 03/24/2010. The Injured Worker testified that she resigned from the position [due] to injury related symptomatology. The 06/15/2010 records of Todd Hochman, M.D. indicate that she was terminated. There is no contemporaneous evidence from a physician that she left this job due to physical difficulties stemming from the allowed conditions. This resignation also coincided with the Injured Worker's marital separation and relocation. The Injured Worker has not worked or sought employment since 03/24/2010. She is currently receiving Social Security [D]isability benefits. The Hearing Officer finds that the Injured Worker has never been released to return to her former position of employment since the date of the instant injury. She did return to work in a light-duty position until she resigned from this position due to factors that were unrelated to the allowed injuries. She relocated due to an upcoming marriage. There is insufficient support in the record for a finding that she left the job due to the allowed conditions. The job change also coincided with a marital separation and relocation. The Injured Worker has not worked or sought work since that time even the limited work permitted of a Social Security Disability recipient. The Hearing Officer finds that the Injured Worker's departure from the third job was unrelated to the allowed injury and was voluntary. She has abandoned the work force since that time. In these circumstances the Injured Worker is not eligible to receive temporary total disability compensation. All proof on file was reviewed and considered.

{¶42} 21. On May 3, 2012, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of March 27, 2012.

{¶43} 22. On February 22, 2013, relator, Dana M. German, filed this mandamus action.

Conclusions of Law:

{¶44} To summarize the factual scenario, following her October 20, 2008 injury, relator returned to work in a light-duty capacity at the Geneva Pointe facility owned and

operated by PSH.  Undisputedly, relator resigned from her employment with PSH in March 2009.  In her deposition testimony, relator indicates that her resignation was motivated by the pain associated with her lower back injury and it coincided with her upcoming marriage and planned move to Ravenna, Ohio.  She also expressed a concern that her co-workers were having to do some of the work she had previously performed.

{¶45}  In September 2009, some six months after leaving her employment with PSH, relator found a factory job with General buffing car parts.  The parts weighed only a couple of pounds each.  In her deposition testimony, relator also indicates that she could not physically do the work when General moved from an 8-hour shift to a mandatory 12-hour shift.  According to relator, she decided, on her own, to quit her job at General.  However, her treating physician, Dr. Hochman, reported that relator was terminated from her employment.  She also testified that she separated from her husband one or two months after quitting her job at General in March 2010 and then she moved in with her daughter.

{¶46}  Relator has not worked, nor sought work, since her March 2010 departure from her employment at General.

{¶47}  The magistrate observes that the SHO's order of March 27, 2012 fails to actually state that relator voluntarily abandoned her employment at PSH or that she voluntarily abandoned her employment at General.  However, concluding "[t]here is insufficient support in the record for a finding that this resignation was related to the allowed conditions," the SHO, in effect, determined that relator's departure from her employment at PSH was not injury-induced and thus was voluntary.

{¶48}  Making a similar statement regarding "insufficient support in the record," the SHO also, in effect, determined that relator's departure from her employment at General was not injury-induced and thus was voluntary.

{¶49} The magistrate further observes that the SHO's order refers to a "departure from the third job" when only two employers are involved here.  Apparently, the SHO counted relator's return to work at PSH in a light-duty capacity as a job separate from the job she worked prior to her injury.  Given this observation, the magistrate rejects relator's conclusion that "[o]ddly, and astonishingly, the order refers

to a non-existent 'third job' that German supposedly abandoned."  (Relator's reply brief, 5.)

{¶50}  The magistrate also observes that the SHO determined that relator "has abandoned the work force" since her departure from her employment at General. Presumably, this determination is premised upon the finding that relator "has not worked or sought employment since 03/24/2010."

{¶51} Two main issues are presented:  (1) did the commission abuse its discretion in determining that relator voluntarily abandoned her employment with PSH, and (2) did the commission abuse its discretion in determining that relator voluntarily abandoned her employment at General?

{¶52}  The magistrate finds:  (1) the commission did not abuse its discretion in determining that relator voluntarily abandoned her employment with PSH, and (2) the commission did not abuse its discretion in determining that relator voluntarily abandoned her employment at General.

{¶53}  Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

## Basic Law

{¶54}  Historically, this court first held that, where the employee has taken action that would preclude his returning to his former position of employment, even if he were able to do so, he is not entitled to continued TTD benefits since it is his own action, rather than the industrial injury, which prevents his returning to his former position of employment. *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.*, 29 Ohio App.3d 145 (10th Dist.1985).  The *Jones & Laughlin* rationale was adopted by the Supreme Court of Ohio in *State ex rel. Ashcraft v. Indus. Comm.*, 34 Ohio St.3d 42 (1987), wherein the court recognized a "two-part test" to determine whether an injury qualified for TTD compensation. *Ashcraft* at 44.  The first part of the test focuses upon the disabling aspects of the injury whereas the latter part determines if there are any other factors, other than the injury, which prevent the claimant from returning to his former position of employment. *Id.*

{¶55} In *State ex rel. Rockwell Internatl. v. Indus. Comm.*, 40 Ohio St.3d 44 (1988), the court held that an injury-induced abandonment of the former position of employment, as in taking a retirement, is not considered to be voluntary.

{¶56} In *State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.*, 72 Ohio St.3d 401, 403 (1995), the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:

> [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been know to the employee. Defining such an employment separation as voluntary comports with Ashcraft and [*State ex rel. Watts v. Schottenstein Stores Corp.*, 68 Ohio St.3d 118 (1993)]—*i.e.*, that an employee must be presumed to intend the consequences of his or her voluntary acts.

{¶57} In *State ex rel. McKnabb v. Indus. Comm.*, 92 Ohio St.3d 559, 561 (2001), the Supreme Court of Ohio held that the rule or policy supporting an employer's voluntary abandonment claim must be written. The court explained:

> Now at issue is Louisiana-Pacific's reference to a written rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
>
> The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.

{¶58}  The syllabus of *State ex rel. McCoy v. Dedicated Transport Inc.*, 97 Ohio St.3d 25, 2002-Ohio-5305, states:

> A claimant who voluntarily abandoned his or her former position of employment or who was fired under circumstances that amount to a voluntary abandonment of the former position will be eligible to receive temporary total disability compensation pursuant to R.C. 4123.56 if he or she reenters the work force and, due to the original industrial injury, becomes temporarily and totally disabled while working at his or her new job.

{¶59}  The *McCoy* holding was further explained by the court in *State ex rel. Eckerly v. Indus. Comm.*, 105 Ohio St.3d 428, 2005-Ohio-2587.  In that case, the claimant, Shawn E. Eckerly, was fired from his job for unexcused absenteeism. Thereafter, the commission declared that the discharge constituted a voluntary abandonment of his employment under *Louisiana-Pacific*, and denied TTD compensation.  Citing *McCoy*, the *Eckerly* court upheld the commission's denial of TTD compensation.  The *Eckerly* court explains:

> The present claimant seemingly misunderstands *McCoy*. He appears to believe that so long as he establishes that he obtained another job-if even for a day-at some point after his departure from Tech II, TTC eligibility is forever after reestablished. Unfortunately, this belief overlooks the tenet that is key to *McCoy* and all other TTC cases before and after: that the industrial injury *must remove the claimant from his or her job*. This requirement obviously cannot be satisfied if claimant had no job *at the time of the alleged disability*.

(Emphasis sic.)  *Id.* at ¶ 9.

### First Issue

{¶60}  To begin, it can be noted that relator's presumed inability to perform all of the duties of her former position of employment at the time she resigned her employment with PSH did not bar a commission finding that she voluntarily abandoned her employment with PSH.  That is to say, a commission finding of a voluntary abandonment was not precluded by the fact that relator was working in a light-duty capacity at the time of her resignation and was thus presumed to be unable to perform all the duties of her former position of employment.  *State ex rel. Adkins v. Indus.*

*Comm.,* 10th Dist. No. 07AP-975, 2008-Ohio-4260; *State ex rel. Apostolic Christian Home, Inc. v. King,* 10th Dist. No. 08AP-1078, 2009-Ohio-5670.

{¶61}  In finding that relator's departure from her employment at PSH was not injury induced and therefore voluntary, the SHO relied in part upon a finding that "[t]here is no contemporaneous evidence from a physician that she left the job due to physical difficulties stemming from the allowed conditions."  Citing this court's decision in *State ex rel. Mid-Ohio Wood Prods., Inc. v. Indus. Comm.,* 10th Dist. No. 07AP-478, 2008-Ohio-2453, relator contends that the commission abused its discretion by relying upon the lack of contemporaneous medical evidence to support the finding that the departure from employment at PSH was not injury induced.  As relator puts it, the commission "can rely solely upon the injured worker's testimony of his physical condition."  (Relator's brief, 18.)  Put another way, relator posits "[t]here is no requirement of objective medical evidence corroborating an injured worker's testimony regarding why he left his employment."  (Relator's brief, 18.)  Put yet another way, relator argues that the commission abused its discretion by requiring that she "produce evidence that she was advised by her doctor to leave her employment."  (Relator's brief, 19.)

{¶62}  Relator's reliance upon *Mid-Ohio* is misplaced and her arguments lack merit.

{¶63}  In *Mid-Ohio,* the commission awarded TTD compensation to claimant, David L. Franks, and in so doing, determined that his job departure was injury-induced. In determining that the job departure was injury-induced, the commission seemingly relied exclusively upon the claimant's testimony.

{¶64}  The *Mid-Ohio* court states, at ¶ 18:

> We have carefully reviewed the cases that the magistrate cites in his decision, and we find nothing in them that holds that there must be objective medical evidence corroborating a claimant's testimony regarding his motivation for abandonment of his employment. On the contrary, as noted hereinabove, the commission must make a factual determination, based upon all of the surrounding circumstances, whether the motivation for the claimant's departure was, in whole or in part, the allowed conditions for which the claimant has already discharged his burden of

> proof. Here, the commission did so, and did not abuse its discretion in crediting the claimant's testimony, particularly in light of the office notes from Drs. Bennington, Ellis, and Dyer, which indicate that the claimant reported suffering severe, constant back pain since the date of injury. The commission is the exclusive evaluator of weight and credibility of the evidence.

*Id.* ¶ 18.

{¶65} While the commission may credit a claimant's testimony as to his or her motivation for abandonment of employment without corroborating medical evidence, the commission need not do so. That is, the commission is free to discredit the claimant's testimony because there is no corroborating medical evidence or because the commission finds that the medical evidence is insufficient to corroborate the testimony. Accordingly, the magistrate finds relator's arguments unpersuasive.

{¶66} Citing this court's decision in *State ex rel. Monroe v. Indus. Comm.*, 10th Dist. No. 04AP-1198, 2005-Ohio-5157, relator suggests that the commission was required to find that the job abandonment at PSH was injury induced because relator gave two reasons for her job departure—that is, relator testified that the pain motivated her decision  and she was getting married and moving to Ravenna.  Relator points out that "[a]t no time, however, did she indicate that moving due to a new marriage and relocation was the primary reason or even a compelling reason to leave [PSH]." (Relator's reply brief, 1-2.)

{¶67} Relator's argument and reliance upon *Monroe* is incorrectly premised upon the unstated presumption that the commission was required to give full credit to all of relator's testimony and to give her testimony an interpretation favorable to an injury-induced job abandonment.

{¶68} The commission, and its hearing officers, like any fact-finder in any administrative, civil or criminal proceeding, may draw reasonable inferences and rely upon its own common sense in evaluating the evidence.  *See State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089.

{¶69} Here, the commission, through its SHO, apparently found that it was relator's remarriage and relocation that primarily motivated her job departure.  This

finding was clearly within the commission's fact-finding discretion based upon the evidence of record.

{¶70} Accordingly, the magistrate finds that the commission did not abuse its discretion in determining that relator voluntary abandoned her employment with PSH.

### Second Issue

{¶71} The second issue is whether the commission abused its discretion in determining that relator voluntarily abandoned her employment at General. It should be observed that this inquiry is only relevant because the commission correctly determined that relator voluntarily abandoned her employment with the employer of injury, PSH, and, thus, she is ineligible for TTD compensation unless she reestablished her eligibility by reentering the workforce under *McCoy* and *Eckerly.*

{¶72} Presumably, if relator can show that her departure from employment at General was injury induced, she can preserve her eligibility for TTD compensation that was undisputedly reestablished during the time of her employment at General. If, however, the commission correctly determined that relator's departure from her employment at General was not injury induced, she consequently lost her eligibility at the time of her departure from General and has not reestablished that eligibility.

{¶73} The magistrate concludes that the commission did not abuse its discretion when it determined that relator's departure from her employment at General was not injury induced.

{¶74} Relator's challenge to the commission's determination that her departure from General was voluntary is essentially the same as her challenge to the commission's determination that her departure from PSH was voluntary.

{¶75} That is, relator contends that the commission abused its discretion in placing reliance upon the finding "[t]here is no contemporaneous evidence from a physician that she left the job due to physical difficulties stemming from the allowed conditions." As earlier noted, relator's reliance upon *Mid-Ohio* is misplaced.

{¶76} Relator points to her deposition testimony in which she states that she left her position as General because she was not able to physically perform the buffing job when the employer changed to mandatory 12-hour shifts. Relator, in effect, asks this court to reweigh the evidence—something this court will not do in a mandamus action.

The commission weighed the evidence and determined that relator's departure from her employment at General was primarily motivated by matters unrelated to the allowed conditions of the claim.  This determination was within the sound discretion of the commission and cannot be disturbed in this mandamus action.

{¶77}  Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.


/S/ MAGISTRATE
KENNETH W. MACKE



**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).